COMMONWEALTH *vs.* ENFRID BROWN, JR., & others. (and five companion cases[1]).

Suffolk.   December 2, 1974. — February 14, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Homicide.   Accessory and Principal.   Practice, Criminal,* Verdict, Charge to jury, Deliberation of jury, Selection of jury.   *Probable Cause.   Search and Seizure.   Jury and Jurors.*

At the trial of indictments against several defendants charging murder and armed entry of a dwelling and assault with intent to commit a felony, testimony that a defendant was one of a band of armed men who burst into an apartment and shot and killed the victim was sufficient to substantiate the charges against that defendant without evidence that he had a gun or fired a shot.   [27]

Where it appeared in a murder case that, although verdicts of not guilty were returned, affirmed and recorded and the jury were discharged and allowed to retire, within a few minutes thereafter the foreman informed a court officer that there was "something wrong" with the verdicts, whereupon the jury were brought back into the court room and there indicated to the judge that the

[1] Of the companion cases one is against Enfrid Brown, Jr., two are against William J. Johnson, Jr., and two are against John Clinkscales.

verdicts as reported did not reflect their agreed decision, and that they had remained an undispersed unit under the control of the court and in the custody of court officers, had had no further deliberation, had not commingled with the general public, and had not been influenced by anyone, there was no error on the part of the judge in permitting corrected verdicts of guilty to be returned, affirmed and recorded. [27-29]

At the trial of indictments for murder a supplemental charge to the jury, after they had failed to reach a verdict, which, among other departures from the charge in *Commonwealth* v. *Tuey,* 8 Cush. 1, stated that if a majority of jurors were in favor of conviction a dissenter should consider whether his doubt was reasonable, but did not state the converse for a dissenting juror if a majority was for acquittal and therefore gave the impression that acquittal was not a real alternative, was sufficiently erroneous to require a new trial. [29-32]

Where police were informed that a shooting incident involved several black men who had driven off in a car of a certain make and color and having certain characteristics, and who were named and identified as belonging to a specified organization, the police had probable cause both to arrest the occupants of a car fitting the description given which drove up to the headquarters of such organization and also to conduct a warrantless search of the car [32-33]; after such incidents the police also had probable cause to enter the headquarters without a warrant, to arrest one of its occupants identified by a witness of the shooting, to arrest the other five occupants of the headquarters after they had been told that their colleague was being arrested for murder but had refused to identify themselves, and to search one of the five occupants at the police station after his arrest [33-34]; because the police had probable cause to make such arrests and searches, motions to suppress evidence acquired from the searches were properly denied [34].

Where it was clear that on a new trial of a murder case the death penalty could not be imposed by reason of the decision in *Furman* v. *Georgia,* 408 U. S. 238, there would be no occasion for interrogating prospective jurors as to their views on capital punishment. [34-35]

INDICTMENTS found and returned in the Superior Court on May 16, 1973.

The cases were tried before *Roy,* J.

*Monroe L. Inker* (*Stephen R. Katz* with him) for the defendant Brown.

*Robert J. Ciolek & Martin K. Leppo* for the defendants Johnson & Clinkscales.

*Thaddeus R. Beal, Jr.,* Assistant District Attorney, & *Roger A. Emanuelson,* Special Assistant District Attorney, for the Commonwealth.

*David A. Barry & John Reinstein* for Civil Liberties Union of Massachusetts and *Anthony G. Amsterdam* of California & *Jack Himmelstein* of New York, for NAACP Legal Defense and Education Fund, Inc., joined in a brief as amici curiae.

BRAUCHER, J.   These murder appeals bring to us numerous assignments of error.   We reverse the convictions because the judge's "dynamite charge" to the jury went beyond that approved in *Commonwealth* v. *Tuey,* 8 Cush. 1 (1851).   Cf. *Allen* v. *United States,* 164 U. S. 492, 501 (1890).   We also pass on the questions likely to recur at a new trial.

The victim, Allen Donaldson, also known as Hakim A. Jamal, lived in a third-floor apartment in Roxbury with five other people.   They were all in the apartment about 11 P.M. on May 1, 1973, when four or five men stormed into the apartment, shot the victim three, four or five times, and killed him.   The three defendants were arrested early in the morning of May 2, 1973, and later were indicted for murder and for entering a dwelling being armed and making an assault with intent to commit a felony.   Trial began July 16, 1973, and was completed August 2, 1973.   Each defendant was convicted of murder in the first degree and sentenced to death.   Each was also convicted on the armed entry charge and sentenced to life imprisonment.   Each appealed under G. L. c. 278, §§ 33A-33G.

We discuss first those assignments of error which if sustained would require judgments of not guilty.   Next we discuss the *Tuey* issue, on which we reverse and remand for a new trial.   We then consider issues as to suppression of evidence which are likely to recur at a new trial.

Finally, we refer briefly to other issues which need not be decided in view of our disposition of the cases.

1. *Brown's motions for directed verdicts.* The defendant Brown argues that his motions for directed verdicts were erroneously denied. In part this claim rests on an attack on testimony of the witness Griffin, originally a codefendant, as to statements by Brown. Wholly apart from Griffin's testimony, however, Linda Jacobs, one of the surviving occupants of the invaded apartment, testified that she had known Brown for a year and recognized him as one of the intruders. In view of testimony that a band of armed men burst into the apartment and shot and killed the victim, there was no need for testimony that Brown had a gun or that he fired a shot. *Commonwealth* v. *Medeiros,* 354 Mass. 193, 197 (1968). *Commonwealth* v. *Connolly,* 356 Mass. 617, 629 (1970). There was no error in denying the motions.

2. *Correction of verdicts.* On the afternoon of the second day of their deliberations, the jury returned verdicts of not guilty on the three murder indictments and guilty on the three indictments for armed entry. The verdicts were affirmed by the jury and recorded, and the jury were discharged and allowed to retire. Four minutes later the jury returned to the court room and were permitted to correct the verdicts. The foreman said, "The way the Clerk read the charges to us, or the indictments, was not the same as the form that we were using in the case. . . . We had written down 'not guilty' of the intent of entering to murder. But we did find him guilty of murder in the first degree on the charge of a felonious murder." Corrected verdicts of guilty of murder in the first degree and guilty of armed entry were then returned, affirmed and recorded, and the jury were again permitted to retire. The defendants assign error in permitting the jury thus to change their verdicts.

The judge held an evidentiary hearing after the trial, and testimony was given by two court officers and the clerk. He found that there was no indication of dis-

pleasure or disapproval of the initial verdicts by anyone, that the two alternate jurors left the court room first, followed by a court officer and then by the twelve jurors, and that as they reached the top of the stairs leading to the jury room the foreman said to the court officer, "There is something wrong in the verdict." There had been no commingling of the jurors with any members of the general public and no conversation between the jurors and the alternate jurors. The judge was promptly informed, and the jury were brought back into the court room. Despite the announcement of their discharge, the judge found, they remained an undispersed unit, still within the control of the court and in the custody of the court officers, and they were not subject to any judicial or extra-judicial influence before they returned to the court room to announce the true verdicts. He denied the defendants' motions for a mistrial.

Before a verdict has been affirmed and recorded, the judge may set it aside or instruct the jury and send them out for further deliberation. *Commonwealth* v. *Green,* 302 Mass. 547, 557 (1939), and cases cited. That power terminates when the verdict is affirmed and recorded. *Commonwealth* v. *Haskins,* 128 Mass. 60, 61 (1880). *James* v. *Boston Elev. Ry.* 213 Mass. 424, 426-427 (1913). Moreover, once the jury have been discharged, they have no further power to deliberate or to agree to a verdict. *Commonwealth* v. *Townsend,* 5 Allen 216, 218 (1862).

Nevertheless, we have allowed juries to correct formal and clerical errors in the recording of verdicts to which they had properly agreed. *Capen* v. *Stoughton,* 16 Gray 364, 367 (1860). *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 386-388 (1912). *Lapham* v. *Eastern Mass. St. Ry.* 343 Mass. 489, 492-493 (1962). We think that principle applies to deny finality to the original verdicts here, since the jury, by their own action and without any suggestion from the judge or any one else, immediately indicated that the verdicts reported did not state what

they had agreed to. Cf. *Commonwealth* v. *Rego,* 360
Mass. 385, 393 (1971); *Summers* v. *United States,* 11
F. 2d 583, 586 (4th Cir. 1926), cert. den. 271 U. S. 681
(1926); *Anderson* v. *State,* 231 Miss. 352, 360-361 (1957).
We distinguish cases where the change reflects further
deliberation or where there has been an opportunity for
outside influence. *People* v. *Rushin,* 37 Mich. App. 391,
396-400 (1971). *State* v. *Brandenburg,* 38 N. J. Super.
561, 564-567 (1956). *State* v. *Hamilton,* 250 N. C. 85,
89 (1959). *Commonwealth* v. *Johnson,* 359 Pa. 287,
293-294 (1948). *Melton* v. *Commonwealth,* 132 Va.
703, 711-712 (1922).

The question whether the erroneous verdicts were final
is distinct from the question whether the fresh verdicts
were themselves erroneous and therefore vulnerable to
the motions for mistrial which were promptly made. The
present record shows no impropriety in the correction of
the verdicts on the murder indictments. As to the armed
entry indictments, however, the judge had instructed the
jury that if there was a reasonable doubt "that they went
there to murder Hakim, these defendants must be found
not guilty on that indictment." The quoted instruction
may well have been too favorable to the defendants, but
it was the basis for the jury's deliberations. In view of
that instruction and the foreman's statement that the jury
had not found the requisite intent, there is a serious ques-
tion whether any of the verdicts on the armed entry
indictments can stand. In view of our disposition of the
*Tuey* issue, however, we do not pursue this point further.
It is sufficient for present purposes that the erroneous
"not guilty" verdicts on the murder indictments do not
preclude a new trial.

3. *The Tuey charge.* The cases were vigorously con-
tested, and largely turned on the credibility of the wit-
nesses. The five surviving occupants of the invaded
apartment all testified to the intrusion, but only two of
them, Linda Jacobs and her nine year old son, could
identify any of the defendants as intruders. Griffin,

originally a codefendant, testified to statements by the defendant Brown naming five intruders, including the three defendants but not Griffin. A neighbor testified that he saw four men get into a car and drive away immediately after the intrusion, and there were a number of other discrepancies in the various accounts. Each of the defendants introduced alibi testimony.

The jury retired to deliberate at 11:30 A.M. August 1, 1973, and deliberated until recessed for the night. On August 2, 1973, the judge gave further instructions in response to two questions submitted by the jury with respect to the distinction between first and second degree murder. The jury continued its deliberations until 2:35 P.M. on the second day, and the judge then gave the supplementary charge set out in the margin,[2] modeled in part on the charge in *Commonwealth* v. *Tuey*, 8 Cush.

---

[2] "I brought you down here to remind you during the course of your deliberations of something that I said to you in my principal charge. That is this: that a juror who remains absolutely stubborn, with a closed mind and a deaf ear to the well-founded views of fellow jurors, is not performing the responsibilities of a juror correctly.

"Now, I remind you that, although the verdict must be the verdict of each individual juror, nevertheless, each of you must examine the questions submitted by others who hold opposing views with frankness and fairness, and with a proper regard and deference to the views of your fellow jurors.

"I do not know the areas within which you may have failed to reach an agreement. I cannot inquire into that and I would not inquire into it. But I have this to say to you, and you must listen to it very seriously: If you have failed to agree at this time on the general area of innocence or guilt, bear this in mind: If much the larger number of jurors are for conviction, a disagreeing juror or jurors should consider whether his or her doubt is a reasonable one, where it makes no impression on the majority, the other jurors, who are equally honest, equally intelligent, and equally conscientious.

"I shall say something similar to you now if your failure to agree is upon the degree of murder. If the larger number of jurors are for a verdict of murder in the first degree, a disagreeing juror or jurors should consider whether or not he is reasonable in deeming the circumstances of the case as not being aggravated enough for a first degree verdict.

1, 2 (1851). At 3:49 P.M. the jury returned to the court room with verdicts.

The charge was given four days before our decision in *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 97-101 (1973), and the judge did not have the benefit of our discussion and suggested revision of the *Tuey* charge. Since the *Rodriquez* decision, we have continued to uphold the use of the *Tuey* charge in cases tried before that decision. *Commonwealth* v. *Valliere,* 366 Mass. 479, 496-497 (1974). Cf. *Commonwealth* v. *Pleasant,* 366 Mass. 100, 104-105 (1974). But we long ago recognized that the *Tuey* charge goes "nearly if not quite to the extreme limit." *Highland Foundry Co.* v. *New York, N. H. & H. R.R.* 199 Mass. 403, 407 (1908). The charge given in the present case went further.

The present charge avoided one vice of the original *Tuey* charge, the assertion that "the case must at some time be decided," but it introduced a new defect in its reference to the "cost in terms of money and effort and time that a case of this sort entails." See *Commonwealth* v. *Pleasant, supra.* It also suggested that minority jurors might be thought "absolutely stubborn, with a closed mind and a deaf ear to the well-founded views of fellow jurors." Cf. *Powell* v. *United States,* 297 F. 2d 318,

---

"If, on the other hand, the majority are for second degree murder, those in the minority ought to ask themselves whether they might not reasonably doubt their views where they are not considered appropriate by the other jurors.

"Now, the law seeks a resolution to these cases, and in the event of disagreement, it simply means that this case must be tried over again by another jury. Now, you must have some understanding of the cost in terms of money and effort and time that a case of this sort entails. And you must have some understanding of the money that's expended in the keeping of the jurors in a hotel, and seeing that they are reasonably content during the course of a long trial like this. We seek to avoid having to try cases of this type over again.

"Now, having that in mind, I ask you to return to take these words of advice seriously, because I could not utter them more seriously than in the manner I am now doing, and to return and to strive so that you may proceed and come to a conscientiously held verdict."

319-322 (5th Cir. 1961). The emphasis of the original *Tuey* charge is considerably changed by omission of language requiring that the verdict to which a juror agrees must be "the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows," and that "it is your duty to decide the case, if you can conscientiously do so." *Highland Foundry Co.* v. *New York, N. H. & H. R.R.* 199 Mass. at 409 (1908). Cf. *United States* v. *Rogers,* 289 F. 2d 433, 436-437 (4th Cir. 1961). See note, 47 N. Y. U. L. Rev. 296, 302 (1972). This change of emphasis is reinforced by omission of the reiteration in the original *Tuey* charge of the burden on the Commonwealth to establish every part of the case beyond a reasonable doubt.

The cumulative effect of these changes from the original *Tuey* charge is to increase its coercive effect and to cast the balance substantially more in favor of conviction. But we need not decide whether their cumulative effect requires reversal, in view of a more glaring departure. The judge stated that, if much the larger number were for conviction, a disagreeing juror should consider whether his doubt was a reasonable one. He did not, however, follow the original *Tuey* charge in stating a similar proposition for a dissenting juror if a majority were for acquittal. The Commonwealth defended this departure in argument by pointing out that the jury's questions about the distinction between first and second degree murder showed what concerned them. If the judge drew any such inference, however, and based his instructions on it, we think he invaded the province of the jury. The net effect was to give the impression that acquittal was not a real alternative. This was error, and in the special circumstances of this case a new trial is required. Cf. *United States* v. *Flannery,* 451 F. 2d 880, 883 (1st Cir. 1971); *State* v. *Walters,* 145 Conn. 60, 62-65 (1958). See note, 53 Va. L. Rev. 123, 129 (1967).

4. *Suppression of evidence.* The defendants sought to suppress evidence found in a search of a car, in a search

of a second story apartment referred to as the Tee Pee, and in a search of one of the defendants arrested in the Tee Pee. After voir dire hearings, the judge made findings and denied the motions to suppress. We summarize his findings.

Minutes after the shooting, the police spoke to the surviving occupants of the invaded apartment and to a downstairs neighbor. They were told that the shooting involved four or five black men, and four names were given: Phillips Key, Griffin, and the defendants Brown and Johnson. All were said to be members of the De Mau Mau organization, whose headquarters were in the Tee Pee. Four of them were said to have left the scene in a yellow Toyota station wagon with a roof rack, a dented side, and a loose front license plate.

Within two hours after the shooting, the police went to the Tee Pee. A yellow Toyota station wagon answering the description given drove up with three black men in it. The automobile was stopped, the three men were arrested, and the automobile was searched. The police did not then recognize or identify any of the three men, although one of them was the defendant Brown and another was one of the men Griffin's testimony placed at the scene of the shooting. We think the judge was plainly right in ruling that there was ample probable cause for the arrest of the occupants of the car and for the warrantless search of the car. *Commonwealth* v. *Brown,* 354 Mass. 337, 342 (1968). *Commonwealth* v. *Breen,* 357 Mass. 441, 446 (1970). *Commonwealth* v. *Cass,* 358 Mass. 805 (1970). *Commonwealth* v. *Jackson,* 359 Mass. 759 (1971). *Commonwealth* v. *Avery,* 365 Mass. 59, 64 (1974). *Commonwealth* v. *Riggins,* 366 Mass. 81, 87-88 (1974).

The search of the car disclosed a registration of the car in the name of Phillips Key, and a bloodstained piece of white towel and a bloodstained field jacket. About this time the police knocked on the door and, receiving no response, entered the Tee Pee. They found six black men

there, and asked them to identify themselves, telling them of the murder, but none identified himself. One of the surviving occupants of the invaded apartment was brought in, and he identified the defendant Johnson as one of the intruders. The police explained that Johnson was being arrested for murder, and asked the other five black men to identify themselves. They responded with obscenities and refused to identify themselves, and were placed under arrest. The defendant Clinkscales was one of those so arrested.

We think the judge was warranted in finding that there was probable cause to enter the Tee Pee without a warrant, to arrest Johnson and then to arrest the other five men, including Clinkscales, and later to search Clinkscales at the police station. *Commonwealth* v. *Lawton*, 348 Mass. 129, 133 (1964) (refusal to respond to threshold inquiry). *Commonwealth* v. *Roy*, 349 Mass. 224, 228-230 (1965) (refusal to answer and evasive responses to threshold inquiry). *Commonwealth* v. *Chaisson*, 358 Mass. 587, 590 (1971) (evasive replies to police questions). *Commonwealth* v. *Andrews*, 358 Mass. 721, 723-724 (1971), and cases cited (entry of apartment and warrantless arrest based on probable cause). *Commonwealth* v. *Battle*, 365 Mass. 472, 476 (1974) (search at police station after arrest). Contrast *Commonwealth* v. *Dirring*, 354 Mass. 523, 531 (1968) (arrest on sole basis that defendant accompanied suspected bank robber). There was therefore no error in refusing to suppress evidence obtained in the searches.

5. *The death penalty; other issues.* Much of the arguments in these cases related to the imposition of the death penalty. Those arguments have been considered in *Commonwealth* v. *Harrington, ante,* 13, 15-22 (1975). Our decision there makes it clear that the death penalty cannot be imposed in these cases. On a new trial, therefore, there will be no occasion for interrogating prospective jurors as to their views on capital punishment, and

we do not consider further the questions raised as to such interrogation.

The defendants assign numerous other errors relating to pre-trial discovery, jury selection, admission and exclusion of evidence, comments by the prosecutor and the judge, and the judge's instructions to the jury. None of the questions presented is likely to arise in a similar context on a new trial. We therefore abstain from further discussion of them.

6. *Disposition.* The judgments are reversed, the verdicts set aside and the cases remanded for a new trial.

*So ordered.*