COMMONWEALTH *vs.* TOBEY BELL.

No. 09-P-1986.

Bristol. June 4, 2010. - October 19, 2010.

Present: GREEN, DREBEN, & MILKEY, JJ.

*Search and Seizure,* Motor vehicle, Probable cause. *Constitutional Law,* Search and seizure, Probable cause. *Probable Cause.*

A police officer making a traffic stop based on a radio report of a recent shooting had probable cause to arrest the driver and search the motor vehicle, based on facts known to police at the time of the stop, namely, the almost exact match of the numbers of the vehicle's license plate with the identification of those numbers by two eyewitnesses, as well as the matching description of the vehicle and the physical and temporal proximity of the vehicle to the crime scene [138-140]; further, the subsequent warrantless search of the vehicle at a police lot was constitutionally valid, where the public parking lot where the vehicle was stopped had sufficient public access to warrant moving the vehicle to a more secure location, and where the delay before police searched the vehicle was, in the circumstances, not unreasonable [140-142].

INDICTMENTS found and returned in the Superior Court Department on June 5, 2008.

A pretrial motion to suppress evidence was heard by *Richard T. Moses,* J., and a motion for reconsideration was considered by him.

Applications for leave to prosecute an interlocutory appeal were allowed by *Margot Botsford,* J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by her to the Appeals Court.

*Shoshana E. Stern,* Assistant District Attorney, for the Commonwealth.

*Paul W. Patten* for the defendant.

DREBEN, J. At approximately 12:50 P.M. on May 1, 2008, three 911 telephone calls were received by the Fall River police department reporting a shooting on South Main Street in that

city. As a consequence of those telephone calls the defendant was apprehended and then arrested, and his vehicle was brought to the police station where it was later searched. After being indicted on charges of assault by means of a dangerous weapon, unlawful possession of a firearm, and unlawful possession of a loaded firearm, the defendant filed a motion to suppress. A judge of the Superior Court allowed the motion in part, suppressing a handgun and gloves and any statements made in response to the discovery of the gun, but denied it as to all other evidence obtained as a result of what the defendant argues was an unlawful stop and search. Before us are cross appeals by the Commonwealth and the defendant allowed by a single justice of the Supreme Judicial Court.

1. *Facts.* We take our facts from the findings of the motion judge occasionally supplemented by uncontroverted evidence from the hearing on the motion to suppress. See *Commonwealth v. Isaiah I.*, 448 Mass. 334, 337 (2007); *Commonwealth v. Ancrum*, 65 Mass. App. Ct. 647, 648 (2006). The first caller, Gerard Cantara, stated that the person who had been shooting was a black male with "jerry curls" wearing a green shirt and jeans. Cantara saw him run into a store and then get into a bronze four-wheel drive vehicle and drive south on South Main Street. The second call was made by an unidentified woman who stated that several shots had been fired, that the shooter was a black male of average height wearing a green shirt, and that he had driven away in a brown Durango with a license plate number of 6808. Sean Cleary was the third 911 caller. He reported that when he was at East Coast Wholesale, a store on South Main Street, two black men ran into the store with the first man being chased by the second; the latter had a gun and was wearing a green shirt. Cleary saw him get into a Dodge Durango with license plate number US 1608 and drive south on South Main Street. Cleary thought the vehicle was gray. He also stated that one of the men had dropped a cellular telephone, which Cleary had retrieved. While he was talking to the 911 dispatcher, two police officers arrived at East Coast Wholesale, and Cleary repeated what he had seen.[1]

The police sent out a broadcast stating that the suspect was a

---

[1]The accounts given by Cantara and Cleary at the hearing on the motion to

black male, wearing a green T-shirt and jeans, with a "jerry curl" hairstyle, who was last seen leaving the scene of the shooting in a brown Dodge Durango heading south on South Main Street. The broadcast did not include the license plate number reported by the unidentified woman or by Cleary.

Officer Wendell Burks heard the broadcast and shortly thereafter noticed a brown Dodge Durango with license plate US 680A driven by a black man wearing a white T-shirt and a "Jheri curls" hairstyle.[2] The Durango was at a stop light on North Main Street, facing south. Believing that the Durango might be the suspect vehicle and its driver the person involved in the shooting, Burks turned and followed the car, losing sight of it once. He then spotted it in the parking lot of the Old Colony Apartments.[3] The driver of the Durango turned the vehicle around in the parking lot and was attempting to leave the lot when Burks blocked the exit with his cruiser. He got out of his car with his weapon drawn, ordered the driver to show his hands, and called for police back-up. When four back-up officers arrived, the driver (later identified as the defendant) was ordered to leave the vehicle and lie "proned down" on the ground.[4] He was then handcuffed.

Officers searched the car but found nothing of relevance to the shooting. Thereafter the defendant was placed in the back of a cruiser and taken back to the scene of the shooting. Pursuant to a written towing policy, the Durango was inventoried and towed to the impound lot of the police department to secure it.

The defendant was freed of his handcuffs, and a show-up identification, taking about two to three minutes, was conducted at the shooting scene. Cleary was unable to identify the defendant as the shooter, and the other witnesses did not want to have anything more to do with the case. The defendant was then

---

suppress varied slightly from the recordings of the 911 calls, but such variations are not significant here.

[2]Burks described the hairstyle as "like a knitted, close-to-the-head kind of hair design."

[3]Burks described the parking lot as being about 150 feet by eighty feet and having "rows of parking in the center" and "parking along the side next to the building." The parking spaces were marked.

[4]The judge seems to have been mistaken in saying the defendant was ordered to leave the car before back-up arrived.

driven to Kennedy Park, about one block away, for another show-up identification. A short time later, Officer Andrew Desrosiers, who was investigating the scene of the shooting, received a radio transmission that the defendant had been placed under arrest.[5] Desrosiers returned to the police station and interviewed the defendant. The latter made various statements after having been given Miranda warnings. The judge found that his waiver of rights under the Fifth Amendment to the United States Constitution was voluntary and intelligent. Later, Desrosiers again spoke to the defendant, advising him that a gun had been found in the Durango. The defendant responded, "See I told you I wouldn't throw it out the window."

The tow truck arrived at the parking lot at 1:20 P.M., and the vehicle was searched at the police lot at about 4:15 P.M. by Detective Elumba, an officer who had received special training in locating hidden compartments in vehicles.[6] After searching the car for about five minutes, Elumba pulled off the control panel of the driver's side front door and discovered a handgun and a pair of gloves. The search was made without a warrant.

2. *The stop.* The judge ruled as follows. Burks had reasonable suspicion to believe that the defendant was involved in the shooting, and thus the stop and Burks's later actions were justified. In making this assessment, Burks, having heard the broadcast, was entitled to take into account the matching description of the vehicle and the suspect, the temporal and physical proximity of the defendant to the place of the shooting, and the fact that a violent crime had just been committed. See *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. at 654. The broadcast was based on information from two named, ordinary citizens who had witnessed the crime, see *Commonwealth* v. *Carey*, 407 Mass. 528, 534 n.4 (1990), and who testified at the motion hearing. The judge found their testimony credible. He correctly pointed out that although the police radio broadcast did not include the license plate number provided by Cleary and the

---

[5] The judge found that there was an identification of the defendant at Kennedy Park.

[6] Elumba had been asked to arrive early for his shift so that he could conduct a search. When he arrived at the police station before 4:00 P.M., the vehicle was being "tended [to] by the State police." No evidence was introduced as to what the State police were doing.

unidentified 911 caller, the knowledge of one officer is imputed to another officer working on the same investigation. See *Commonwealth* v. *Lanoue*, 356 Mass. 337, 340 (1969); *Commonwealth* v. *Quinn*, 68 Mass. App. Ct. 476, 480-481 (2007). The judge also found that the minimal differences in description did not alter his conclusion. See *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 198 (2003).

In its appeal, the Commonwealth argues that the foregoing evidence provided probable cause to search the Durango at the time Burks stopped the defendant. In his cross appeal the defendant claims that Burks lacked not only probable cause but also a valid basis for making an investigatory stop.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). The defendant claims that there were insufficient distinguishing physical characteristics of the vehicle, and that the defendant was wearing a white shirt, not a green one. Moreover, he argues that the place where Burks first saw the defendant was one and one-half miles north of the scene of the shooting, while the suspect was reported to have been last seen driving south from the locus of the shooting. The defendant fails to acknowledge the collective knowledge rule of *Commonwealth* v. *Lanoue*, 356 Mass. at 340, and hence ignores the potent evidence as to the license plate numbers. The differences in descriptions of the color of the car and the color of the defendant's T-shirt are insignificant in view of the almost exact match of the actual numbers of the license plate of the vehicle with the identifications of those numbers by the 911 callers.[7] For this reason, we agree with the Commonwealth's argument that Burks had probable cause to search the vehicle at the time of the stop.[8] See *Commonwealth* v. *Brown*, 367 Mass. 24, 32-33 (1975).

In *Brown*, the defendants sought to suppress evidence found

---

[7]The car's exact license plate was US 608A. Cleary described it as US 1608, and the unidentified woman described it as 6808.

[8]The Commonwealth also points out that after the judge found that there was an identification at Kennedy Park and probable cause to arrest the defendant,

in a car. Minutes after a shooting, police were told by occupants of the invaded apartment that the shooting involved four or five black men who were members of a certain organization with headquarters known as the "Tee Pee." *Ibid.* Four names were given, and four "were said to have left the scene in a yellow Toyota station wagon with a roof rack, a dented side, and a loose front license plate." *Ibid.* Within two hours of the shooting, at the Tee Pee, police saw a yellow Toyota station wagon answering the description with three (not four) black men in it drive up. Although the police did not then recognize or identify any of the three men, the Supreme Judicial Court held that "the judge was plainly right in ruling that there was ample probable cause for the arrest of the occupants of the car and for the warrantless search of the car." *Ibid.* In the present case, the furnishing of the closely matching numbers of the license plate together with the correct make and model of the car are as definitive as the description of the Toyota in *Brown.* The description and the physical and temporal proximity of the vehicle to the crime scene provided, in our view, probable cause to arrest the defendant and search the car. Because of this conclusion, we need not reach the defendant's arguments as to the faults of the Kennedy Park identification.[9]

3. *The search.* The question whether the warrantless search at the police lot was proper is more difficult. While our conclusion as to the validity of the search by Detective Elumba differs from that of the motion judge, we note that his analysis preceded the decision of *Commonwealth* v. *Eggleston,* 453 Mass. 554 (2009).

The defendant correctly argues that the automobile exception applies only after the police objectively have probable cause to believe a motor vehicle parked in a public place contains contraband, and provided that no unreasonable length of time elapses

he stated, "It could be argued that even without evidence of the Kennedy Park identification the evidence available to the police would have supported probable cause to arrest."

[9] We note that not only did the defendant waive the arguments as to that identification, as the judge found, but when the Commonwealth filed a motion to introduce additional evidence to refute the defendant's claim, the defendant objected and the judge precluded the Commonwealth from introducing such evidence.

before the execution of the warrantless search. See *Commonwealth* v. *Eggleston, supra* at 558-559.

There is here a question whether the parking lot was a public place within the meaning of our cases. In *Eggleston* the motion judge found that the public had access to the parking lot where the vehicle was seized. *Id.* at 558 n.3. Here, although the judge found that the towing of the vehicle to the police lot was proper, he stated, "[A]t the time of the stop of the Durango, it was not on a public street and the officers were not faced with the attendant risks when a search is conducted on a public street."[10] In any event, in view of Burks's uncontested testimony as to the size of the apartment house parking lot with "rows of parking" and additional parking on the side, we think the public had sufficient access to it for the police to need to move the defendant's vehicle to a more secure place. See note 3, *supra.* See also *Commonwealth* v. *Motta,* 424 Mass. 117, 124 (1997); *Commonwealth* v. *Lara,* 39 Mass. App. Ct. 546, 548 (1995).

The question of the timing of the search also presents some difficulty. No exigency need ordinarily be shown beyond the inherent mobility of an automobile, but the "automobile exception may not be employed to justify an unreasonable delay between the time when the police objectively have probable cause to search the car and the time when they do so . . . ; the question . . . becomes whether the police delayed execution of the search for an unreasonably long time without plausible justification for the delay." *Commonwealth* v. *Eggleston, supra* at 558-559. Even if the police have "plain and ample opportunity" to obtain a warrant, "the police are nevertheless entitled to forgo application for the warrant if it is reasonable to do so and later to proceed with the search under the automobile exception." *Id.* at 559. The inquiry is "whether a delay in executing a permissible seizure is motivated by reasonable investigative considerations or merely by a desire to avoid the warrant requirement by exploiting the automobile exception." *Id.* at 560.

Here, the judge found that the Durango was secured in the police impound lot for over two and one-half hours before the

[10]This statement is somewhat inconsistent with his conclusion that the "Durango was lawfully towed from the scene of the stop."

Commonwealth *v.* Bell.

search was conducted, that the "obtaining of a warrant was not impracticable," and that the delay was unreasonable. We think, in light of *Eggleston*, the judge here used the wrong standard by focusing on the impracticability of obtaining a warrant. The police waited until the arrival of Elumba, who had special training in finding hidden compartments. He came before his regular shift began and was delayed by the State police "tending" to the vehicle. In these circumstances, we do not think the two and one-half hour delay unreasonable. The search thus fell within the automobile exception; though it was made without a warrant, it was constitutionally valid.

For the foregoing reasons the order partially allowing the motion to suppress is reversed, and a new order shall enter denying the motion in its entirety.

*So ordered.*