COMMONWEALTH vs. STEVEN WEBSTER.

Suffolk. December 8, 1983. — February 23, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Judge. Jury and Jurors. Practice, Criminal,* Interrogation of juror.

At a criminal trial, the judge's actions in summoning the jury to the courtroom shortly after they had begun their deliberations and, in the presence of the other jurors, interrogating one of them at a bench conference concerning some "problems" that juror was having during deliberations required the reversal of the defendant's convictions, in light of the circumstances that the "problem" juror failed to appear on the next trial day, that the other jurors knew that the "problem" juror was disinclined to convict the defendant on certain charges, and that the other jurors had observed the interrogation as well as the defense attorney's strenuous objection to what the judge had said and done. [272-278]

INDICTMENTS found and returned in the Superior Court Department on May 8, 1981, and July 21, 1981.

The cases were tried before *Garrity,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Daniel E. Callahan* for the defendant.

*Michael J. Traft,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. The circumstances of the trial judge's interrogation of an individual juror concerning "some problems" she was having dúring jury deliberations require us to reverse the defendant's convictions of aggravated rape, rape, kidnapping, and assault and battery. We allowed the defendant's application for direct appellate review.

On June 16, 1982, the judge charged the jury, two alternate jurors were selected, the jury retired at 3:22 P.M., and the judge left the bench. Some time later, before 4 P.M., in

a way and at a time not shown on the record, the judge received information that caused him, on his own motion, to bring the jury back into the courtroom. The judge then called one juror to the bench, where a bench conference was held with the prosecutor and defense counsel present. We shall assume that the jury did not hear what was said. It is apparent, however, that the remaining jurors (and presumably the two alternates) saw what went on at the bench.

We set forth the colloquy that followed:

THE JUDGE: "It was just brought to my attention, Ms. [name], that you might have some problems. What are your problems?"

THE JUROR: "Well, first of all, I feel, you know, kind of see him guilty on, you know, hitting her. But the other charges, I can't."

THE JUDGE: "Why? Even though the evidence might be completely compelling, you can't do it?"

THE JUROR: "It just don't seem right because it was two different stories."

THE JUDGE: "It's clear to me that this juror has a serious and profound mental block about considering the evidence."

THE JUROR: "Yes. You know, I can't see giving him time when, you know —"

DEFENSE COUNSEL: "I don't see any such block, your Honor."

THE JUROR: "I can't, because —"

THE JUDGE: "Let me ask you this. Let me be very specific. Are you telling me that you feel that way despite what the evidence was?"

THE JUROR: "I mean, after I listened to both sides."

THE JUDGE: "No, listen to me very closely. It is important that you keep an open mind. It is inconceivable to me that after ten minutes of deliberation,[1] and that's all you have

---

[1] On the next trial day, before deliberations resumed, the judge in instructing the jury further said to them that "you've only been deliberating for a couple of hours, or perhaps an hour — not even an hour, perhaps a half to three-quarters of an hour." And in the same instruction he later said, "[Y]ou've only been deliberating for three-quarters of an hour."

deliberated, you have made up your mind already. Are you telling me that?"

THE JUROR: "On the last two counts of rape and kidnapping."

THE JUDGE: "Why have you made up your mind already? Please let me ask these questions. Go ahead. Why have you made up your mind? Is it because of the race issue?"

THE JUROR: "No, no, no, definitely not. It don't sound right because it was two different stories. I mean, some, you know, like they say, 'Well, he asked for a ride.' They gave him a ride, and they turned around and say he forced himself in the car, which don't sound right."

THE JUDGE: "I think I tend to agree with counsel for the defendant that there is no reason for excusing this juror at this time from deliberations."

THE JUROR: "I mean, it just don't sound right."

THE JUDGE: "Now, let me tell you something. Please listen to me very closely. You took an oath. You took an oath to consider the evidence carefully and to keep an open mind."

THE JUROR: "I did."

THE JUDGE: "For you to make up your mind without listening to —"

THE JUROR: "It wasn't that quick, but after we got there —"

THE JUDGE: "Of course it was that quick. For you to make up your mind without listening to your fellow jurors' views about things is wrong. Now, after you listen to your fellow jurors' views about things, if you still feel the same way, that's fine. Do you understand that?"

THE JUROR: "Yes."

THE JUDGE: "But you have to deliberate this case, and you have to keep an open mind. Now, once you're convinced, that's another thing. But you have to listen, you have to remember what the evidence was, and you have to reflect upon it very carefully. Do you understand that?"

THE JUROR: "Yes."

THE JUDGE: "Fine. Thank you. Now, why don't you go back to the jurors, and I will see counsel here. Think about what I said overnight and tomorrow and tell me how you feel about things, not about the guilt or innocence of the defendant, but whether or not you have been able to keep an open mind during this trial. Tell me that first thing Friday morning, would you?"

THE JUROR: "All right."

THE JUDGE: "Thank you very much."

(Juror excused.)

THE JUDGE: "Now, I want to make a statement for the record. I am convinced beyond any question, based upon my observations of the demeanor of that person and my conversation with her, that she has not given any consideration to the evidence at all. She has not thought about it. In fact, she is a bad juror, and I say that unequivocally. I think, however, I'm in a box, and I think you both would agree that I'm in a box. I mean, we have to deal with stupid jurors; we have to deal with perverse jurors. And, quite frankly, she is both stupid and perverse, and I say that out of her presence. But if she comes back to me on Friday and says that she had kept an open mind, then she must remain on the jury. Do you both understand that?"

THE PROSECUTOR: "The Commonwealth understands that, your Honor."

DEFENSE COUNSEL: "I understand."

THE JUDGE: "Okay."

DEFENSE COUNSEL: "And I'll object, too, Judge, and I'm objecting to your intimidating that lady. I'm objecting to your coming to that conclusion."

THE JUDGE: "Don't you dare yell at me, or I'll kick you out of this courtroom right now. You are yelling at me. Your voice and your demeanor are offensive, and I find and rule that you are being contemptible to the Court. Thank you."

(End of bench conference.)

On the following trial day — there was an intervening holiday in Suffolk County — the "problem" juror telephoned that she was sick. She did not appear. The defendant moved for a mistrial on the ground that the judge had interfered with the jury's deliberations through intimidation of the juror. He also moved that an inquiry be made concerning the reason for the juror's absence. The judge denied the motion, stating that in his opinion "that conversation with that juror the other evening was totally warranted by what that juror indicated to me." The judge then made a further comment that gives some indication of the likely effect of the bench conference on the other jurors. The judge said to defense counsel:

"I also say that your demeanor to me at our conversation at the side last Wednesday was the most offensive demeanor I have ever experienced in ten years of being a judge. You physically sought to intimidate me by your bodily movements and the tone of your voice. I found it to be absolutely extraordinary. I've never experienced any conduct like that in my ten years as a sitting judge. And I thank you."

The judge then ordered that one of the two alternates be selected. The jury, charged to begin deliberations anew, retired at 10:35 A.M. and returned with guilty verdicts at 3:22 P.M.

We need not consider whether the judge erred in substituting an alternate juror without further inquiry and a hearing on the question of replacing the absent juror (see *Commonwealth* v. *Haywood,* 377 Mass. 755, 769-770 [1979]), because the judge should have declared a mistrial on the defendant's motion following the bench conference with the "problem" juror. In *Commonwealth* v. *Hebert,* 379 Mass. 752, 755 (1980), we said that "any questioning of a juror must be neutral and not coercive or otherwise calculated to affect the juror's judgment." Our law does not permit in-

quiry into "the subjective mental processes of jurors, such as the reasons for their decisions." *Commonwealth* v. *Fidler*, 377 Mass. 192, 198 (1979). The jury heard conflicting stories. The juror who had "problems" inferentially had taken a position in the jury room that, for some reason, led someone to send word from the jury room and in turn led the judge to bring the jury into the courtroom. The judge improperly told the juror that she had "a serious and profound mental block about considering the evidence," and implied that she may have violated her oath as a juror. See *Jackson* v. *United States*, 368 A.2d 1140, 1142 (D.C. 1977) (per curiam). This intimated that the judge disagreed with her on the evidence — "Are you telling me that you feel that way despite what the evidence was?" He then said that the period of deliberations was too short for her to have made up her mind. Authority does not support the statement that a verdict could not properly have been reached during that time.[2]

This colloquy has a coercive quality that invades the province of the jury. See *United States* v. *Thomas*, 449 F.2d 1177 (D.C. Cir. 1971). We cannot, of course, tell on this record whether the juror failed to appear on the next trial day because of the effect of the colloquy or because of illness. As a matter of fairness in the trial of criminal cases, we might require more of an investigation, in circumstances such as these, to ensure that the reported illness was real and not a pretext. "A lone juror who could not in good con-

---

[2] See *Commonwealth* v. *Clark*, 292 Mass. 409, 416 (1935), where the jury returned a guilty verdict in a murder case after no more than nineteen minutes of deliberation. In responding to the defendant's claim that the jury did not give the evidence adequate consideration, this court said "[t]he case had been tried fully, and the jury could not help receiving impressions as the case proceeded." See also *United States* v. *Anderson*, 561 F.2d 1301, 1303 (9th Cir.) (per curiam), cert. denied, 434 U.S. 943 (1977); *State* v. *Inman*, 350 A.2d 582, 600-601 (Me. 1976) (forty minutes, murder); *State* v. *Verdone*, 114 R.I. 613, 623 (1975) (thirteen minutes, rape); *State* v. *Killary*, 133 Vt. 604, 607 (1975) (less than forty-seven minutes, first degree murder).

science vote for conviction could be under great pressure to feign illness or other incapacity so as to place the burden of decision on an alternate juror." *United States* v. *Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975).

We think, in any event, that the effect on the other jurors was substantially prejudicial to the defendant. They knew of the juror's disinclination to convict the defendant on certain charges. Presumably, one or more of the other jurors reported that the juror had a "problem." Of course, the judge should have placed more information on the record concerning that communication and should have permitted counsel to express their views on what procedure to follow in view of the sensitive nature of the "problem." See *United States* v. *Ronder*, 639 F.2d 931, 934 (2d Cir. 1981). The jurors saw the "problem" juror interrogated. We cannot say with certainty what the jurors may have inferred from the actions of the participants in the conference with the "problem" juror. We can reasonably infer that the jury could determine that defense counsel strenuously disagreed with what the judge had said or done. The jurors may well have been influenced to believe that the judge expressed his disagreement with the "problem" juror's position. We do know that, on the next day of deliberations, the "problem" juror was absent and the judge told the jury that she had called in sick. We think the jury may well have received a message that the judge wanted guilty verdicts on the more serious charges on which the "problem" juror was in doubt. The proper course would have been to permit deliberations to proceed without judicial intervention and, if there were an apparent deadlock, to deal with the problem with an appropriate charge. See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98 (1973).

Because there is a strong likelihood that the jury may have given special weight to the judge's silent communication (see *Commonwealth* v. *Sylvester*, 388 Mass. 749, 751 [1983]; *Commonwealth* v. *Sneed*, 376 Mass. 867, 870 [1978]) and because there were significant factual issues in

contest,[3] we have no alternative but to reverse the judgments, set aside the verdicts, and remand the cases for a new trial.

*So ordered.*

---

[3] The defendant's testimony directly contradicted the testimony of the complaining witnesses. In addition, one of those witnesses had changed her story.