COMMONWEALTH *vs.* MYLES J. CONNOR, JR.

Norfolk. January 13, 1984. — August 21, 1984.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Evidence,* Cross-examination, Other offense. *Jury and Jurors.
Practice, Criminal,* Interrogation of jurors, Deliberation of jury, Exami-
nation of jurors, Disclosure of evidence, Argument by prosecutor, Grand
jury proceedings.

Where the principal thrust of the defense at a murder trial was an attack on
the credibility of two prosecution witnesses, it was prejudicial error for
the judge to preclude cross-examination of one of these witnesses as to
criminal charges pending against her, for the purpose of showing possible
bias. [840-842] NOLAN, J., dissenting.
It was error requiring reversal of criminal convictions for a judge to discharge
a juror during the jury's deliberations, following an assertion by the
juror that he could not abide by his oath, where the judge held no hearing
and made no findings which would establish the existence of mental
illness of the juror or any other "good cause," as required by G. L.
c. 234, § 26B. [842-847] NOLAN, J., dissenting.
The judge at a murder trial improperly invaded the province of the jury by
asking prospective jurors whether the fact either that a witness received
benefits under the Federal witness protection program or that the witness
was a participant in the crime for which the defendant was on trial would
affect the juror's assessment of the witness's credibility, where both of
these were matters which the jury was entitled to consider. [847-850]
Where the Commonwealth contended at a murder trial that the defendant had
stood by and instructed one of the prosecution witnesses as to how the
witness should murder the victims by stabbing them, the prosecution
had a duty to furnish the defense with a pretrial statement of that witness
to the effect that he twisted a screwdriver in a wound of one of the
victims when so directed by the defendant, and this duty arose no later
than the point in the witness's trial testimony where he stated that,
although the defendant told him to twist the screwdriver, he did not do
so. [850-851]
This court did not consider any duty the Commonwealth had to disclose to
the defendant at a murder trial certain information which might have
resolved ambiguities in its agreement with the principal prosecution
witness, where the information was available to the defense for use in
a retrial. [851-852]

At a murder trial there was no error in excluding questions, on cross-examination of a prosecution witness, as to whether she had asked law enforcement officials to have her boy friend transferred within the correctional system, where the proposed questioning was based on an interview with the witness over two years before the trial and, in the circumstances, it was only remotely relevant to her motive for testifying. [852]

Where, at a murder trial, references to the defendant's prior incarceration were relevant to show the relationship between the defendant and a prosecution witness and also to show the defendant's motivation to reveal the location of the victims' bodies, there was no error in the judge's failure to exclude such references. [852-853]

Statements in a prosecutor's closing argument which characterized a criminal defendant as "the master manipulator," "the mastermind," and "the schemer" were adequately supported by the evidence at the trial and thus permissible. [853]

A prosecutor's reference, during closing argument, to a criminal defendant's courtroom appearance was not improper. [853]

A prosecutor should not, during closing argument, have identified a criminal defendant as the source of friction between law enforcement agencies, where this statement lacked any support in the evidence at the trial. [853]

A prosecutor's knowledge that a certain witness, whom the prosecutor had presented before a grand jury, had given inconsistent testimony on a prior occasion did not subvert the integrity of the grand jury proceeding, where both the witness's testimony and the form of the prosecutor's questioning were sufficient to alert the grand jurors to the inconsistency. [853-855]

INDICTMENTS found and returned in the Superior Court Department on June 26, 1980.

The cases were tried before *McGuire, J.*

*Earle C. Cooley* (*Lisa G. Arrowood* with him) for the defendant.

*Paul V. Buckley & James M. McDonough,* Special Assistant Attorneys General (*Matthew L. McGrath, III,* Special Assistant Attorney General, with them) for the Commonwealth.

HENNESSEY, C.J. The defendant was tried on two indictments charging murder in the first degree for the murders of Susan Webster and Karen Spinney, two indictments charging kidnapping for the kidnappings of Webster and Spinney, one indictment charging him as an accessory after the fact to the murder of Ralph Cirvinale, and one indictment charging him

as an accessory after the fact to assault with intent to kill Anthony DeVingo. The defendant's motions to dismiss the indictments were denied. A jury found the defendant guilty on all indictments. The defendant then filed motions for required findings of not guilty or in the alternative a new trial, pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), which were denied. The defendant later filed a motion for a new trial, pursuant to Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). After a hearing before the trial judge, that motion was also denied. The defendant appeals from his convictions and the denials of the motions. We conclude that the motions for dismissal of the indictments and for required findings of not guilty were properly denied, but we also conclude that the defendant must have a new trial. We reverse.

On the evening of February 21, 1975, Thomas Sperrazza, John Stokes, Spinney, and Webster drove to a bar in Roslindale. Webster and Sperrazza went into the bar; Stokes and Spinney remained in the car. In the bar Sperrazza quarrelled with De-Vingo. When Sperrazza and Webster left, DeVingo followed and Sperrazza shot him. DeVingo was wounded and Cirvinale, who was behind him, was killed. Sperrazza and Stokes dragged Webster into the car and fled. Sperrazza was later convicted of the murder of Cirvinale and of assault with intent to murder DeVingo. See *Commonwealth* v. *Sperrazza,* 372 Mass. 667 (1977).

Sperrazza and Stokes confined Spinney and Webster against their will and drove them to various locations, eventually arriving at an apartment in Quincy. There, sometime during the night, Spinney and Webster were stabbed to death. Their bodies were buried in a wooded area in Northampton, where they were discovered about two and one-half years later. Sperrazza was convicted on two indictments for kidnapping and two for murder in the first degree. See *Commonwealth* v. *Sperrazza,* 379 Mass. 166 (1979).

1. *Limitation of the Cross-examination of Diane Wazen.*

The Commonwealth's case was almost entirely dependent on the testimony of Thomas Sperrazza, as corroborated to some extent by the testimony of Diane Wazen. Sperrazza testi-

fied that the defendant came to the Quincy apartment, decided that Spinney and Webster would have to be killed, told Sperrazza how to kill Spinney, and orchestrated the disposal of the bodies and other evidence. Wazen, one of the occupants of the apartment, corroborated Sperrazza's version when she testified that sometime during the early morning hours of February 22 she telephoned her apartment and the defendant answered.

The principal thrust of the defense was an attack on the credibility of these two witnesses. The defendant extensively cross-examined Wazen, impeached her testimony with criminal convictions, and showed her possible bias by questioning her with respect to benefits she had received under the Federal witness protection program. In addition, the defendant wished to examine the witness regarding pending criminal charges against her. The judge excluded this line of questioning.

The defendant was entitled as of right to question the witness about the pending criminal charges in order to show her motive in cooperating with the prosecution. See, e.g., *Commonwealth v. Martinez,* 384 Mass. 377, 380 (1981); *Commonwealth v. Dougan,* 377 Mass. 303, 310 (1979); *Commonwealth v. Ahearn,* 370 Mass. 283, 287 (1976); *Davis* v. *Alaska,* 415 U.S. 308, 317-318 (1974). This is not a case in which it is clear that the witness had made staements consistent with his testimony before the charges arose. Compare *Commonwealth v. Haywood,* 377 Mass. 755, 758-763 (1979). The defendant made it clear to the judge that the questioning was intended to show bias, not to impeach the witness's general credibility. See *Commonwealth* v. *Martinez, supra.* The Commonwealth argues that because there was extensive inquiry into the witness's bias in general, it was within the judge's discretion to exclude this specific inquiry. See *Commonwealth* v. *Donahue,* 369 Mass. 943, 951, cert. denied, 429 U.S. 833 (1976). But the bulk of the inquiry into bias related to past benefits received by the witness. The receipt of such benefits might have inspired gratitude, but the pendency of criminal charges might have inspired hope of lenity and fear of punishment if such lenity were not obtained. As a source of human motivation, gratitude pales beside hope and fear. In the circumstances, the defendant was entitled to the inquiry he sought.

The judge's restriction of the cross-examination of Wazen was erroneous. Because of this error, the defendant was limited in arguing the witness's motive to lie. The prosecutor, on the other hand, relied on her testimony in his summation and emphasized her lack of any motive to lie. Because the erroneous ruling tended to bolster the credibility of the Commonwealth's witnesses and to impair the defendant's attack thereon, we cannot say that the error was harmless. Reversal is, therefore, required.

2. *Discharge of a Deliberating Juror.*

We conclude that, independently of the error discussed above, the judge's improper discharge of a deliberating juror requires reversal of the defendant's convictions.

The jury were sequestered. On the eleventh day of trial, the judge received a letter from the foreman of the jury stating that the behavior of one of the jurors was eccentric and antisocial and that some of the other jurors had complained about his inadequate personal hygiene. The judge did not show the letter to counsel but informed them that he had received it and that it concerned a juror's social habits. After reports from the court officers of complaints by other jurors and the hotel staff, the judge, after informing counsel of his intentions, privately admonished the juror to improve his hygiene.

During the remainder of the trial the judge received continued reports of problems with the juror's hygiene and, in addition, "repeated reports that this juror would not associate with or speak to other jurors, and that on more than one occasion throughout the trial he had stated that he would not deliberate." The judge was told by an attorney that the juror's father was concerned about his son's ability to fulfil his responsibilities as a juror. The judge also received a call from a woman who said she was the juror's mother, complaining about the jury service of her son, but the judge declined to discuss the matter with her. None of this was related to counsel.

After closing arguments but before the judge's charge to the jury, the judge was informed that the juror would not deliberate. The judge conferred with the juror in the lobby, in the absence of counsel. The judge asked the juror whether he would delib-

erate, and the juror responded that although he could abide by his oath, he would prefer not to deliberate because of the personalities of the other jurors. The judge related the subsance of the conversation to counsel. The prosecution asked that the juror be excused. Defense counsel, after conferring with the defendant, asked that the juror not be excused. The judge then recalled the juror to the lobby and, again in the absence of counsel, asked the juror for his views on the problem. The juror stated his belief that the other jurors would decide the case on the basis of emotion rather than reason and that he could not assist them in reaching a fair verdict because they were unreceptive. The juror was not excused and went on to become a deliberating juror.[1]

After eleven hours of deliberation the judge received a note from the foreman stating, "A particular juror says he cannot keep the oath." The judge informed counsel that he intended to bring the juror to the lobby and inquire whether the juror could keep the oath. Defense counsel requested that the court inquire more deeply into the facts and circumstances relevant to the juror's conclusion. The juror was escorted to the lobby and, in the presence of counsel, the judge read him the oath and asked him whether he could fulfil the obligation imposed by it. The juror replied negatively and was immediately discharged. Defense counsel objected to the discharge and moved for a mistrial. The motion was denied and an alternate juror was seated.

The discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error. It is to be done only in special circumstances, and with special precautions. Great care must be taken to ensure that a lone dissenting juror is not permitted to evade his responsibilities. See *United States* v. *Lamb,* 529 F.2d 1153, 1156 (9th Cir. 1975). Thus a judge must

---

[1] The questioning of a juror in the absence of counsel and the defendant, although undertaken before deliberations had begun, was at best a doubtful course. Indeed, the absence of the defendant may well itself have constituted reversible error because the defendant's presence is "crucial as a safeguard of his right to an impartial jury," *Commonwealth* v. *Robichaud,* 358 Mass. 300, 302 (1970), and there was no waiver on the record of this fundamental right.

hold a hearing adequate to determine whether there is good cause to discharge a juror. *Commonwealth* v. *Haywood,* 377 Mass. 755, 769-770 (1979).[2] However, because the inquiry may well lead to a conclusion that the juror cannot be discharged, the judge must scrupulously avoid any questioning that may affect the juror's judgment. *Commonwealth* v. *Webster,* 391 Mass. 271, 275-276 (1984). Further, whether a "problem" juror is discharged or retained, the judge's words and actions must not convey any improper silent messages to the other jurors. *Id.* at 277. In dealing with all aspects of the problem of discharging a deliberating juror, the utmost caution is required to avoid invading the province of the jury. This general principle has been stressed in cases dealing with the wording of supplementary instructions to a deadlocked jury. See *Commonwealth* v. *Jones,* 373 Mass. 423, 427-428 (1977); *Commonwealth* v. *Brown,* 367 Mass. 24, 29-32 (1975); *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 97-103 (1973). Although a mistrial may be expensive in both human and monetary costs, it is not to be avoided by intrusion into the jury's domain. The possibility that an unreasonably stubborn or eccentric juror will be seated is an unavoidable risk of the jury system.

General Laws c. 234, § 26B, as amended through St. 1979, c. 344, § 9A, provides that if a deliberating juror "dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged." "Good cause" includes only reasons personal to a juror, having nothing whatever to do with the issues of the

---

[2] "We think it instructive to add that, in the future, before a juror is excused from deliberations and replaced by an alternate juror, the judge should hold a hearing and be fully satisfied that there is a meritorious reason why a particular juror should not continue to serve. Depending on the nature of the reason why replacement of the juror is being considered, the juror's presence may or may not be required, but all other personnel with relevant information should be heard by the court and counsel before the juror is formally discharged. The judge then should consider whether, in view of all the circumstances, an alternate juror should be substituted. . . . If a judge determines that the substitution of an alternate juror is appropriate, then the judge, as the judge did here, must instruct the jury to disregard all prior deliberations and begin its deliberations again" (citations omitted). *Commonwealth* v. *Haywood, supra* at 769-770.

case or with the juror's relationship with his fellow jurors. In order to determine whether good cause exists, a hearing must be held. *Commonwealth* v. *Haywood, supra*. At the hearing, the issues of the case and the juror's relationship to his fellow jurors are not to be discussed. See *Commonwealth* v. *Webster, supra* at 275-276.[3] If the "problem" juror is questioned, the judge should preliminarily inform him that he cannot be discharged unless he has a personal problem, unrelated to his relationship to his fellow jurors or his views on the case.[4] Unless the juror indicates a belief that he has such a problem, all questioning should cease. If a juror is discharged and an

[3] "We need not consider whether the judge erred in substituting an alternate juror without further inquiry and a hearing on the question of replacing the absent juror (see *Commonwealth* v. *Haywood*, 377 Mass. 755, 769-770 [1979]), because the judge should have declared a mistrial on the defendant's motion following the bench conference with the 'problem' juror. In *Commonwealth* v. *Hebert*, 379 Mass. 752, 755 (1980), we said that 'any questioning of a juror must be neutral and not coercive or otherwise calculated to affect the juror's judgment.' Our law does not permit inquiry into 'the subjective mental processes of jurors, such as the reasons for their decisions.' *Commonwealth* v. *Fidler*, 377 Mass. 192, 198 (1979)." *Commonwealth* v. *Webster, supra* at 275-276. At the time the instant case was tried, the judge did not have the benefit of our decision in the *Webster* case.

[4] In *State* v. *Trent*, 157 N.J. Super. 231 (1978), rev'd on other grounds, 79 N.J. 251 (1979), the court, in applying a rule similar to G. L. c. 234, § 26B, said: "The rule permits substitution of an alternate when the deliberating juror dies, becomes ill 'or is otherwise unable to continue.' These are, of course, precisely the circumstances mandating substitution of a juror during the trial itself. Because they relate exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself, they are ordinarily not circumstances having the capacity to affect the substance or the course of the deliberations. Hence the continuation of the trial with a substituted alternate is in these circumstances no way violative of defendant's right to trial by a fair and impartial jury. In this respect the 'unable to continue' standard is much narrower than the concept of good cause requiring the discharge of prospective jurors before trial commences." *Id.* at 239.

Although we endorse the above language and the reasoning used by the New Jersey court, we observe that the result reached may be of doubtful validity. The court upheld a trial judge's discharge of a juror because of "physical illness," but the facts show that the physical illness was inextricably tied to the juror's difficulties in deliberating. On appeal the Supreme Court of New Jersey reversed but did not reach the issue of the propriety of the discharge.

alternate substituted, the jury should be instructed not only to begin deliberations anew (see G. L. c. 234, § 26B) but also that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or his relationship with his fellow jurors. See *Commonwealth* v. *Haywood, supra* at 770 n.15.

The discharge of the "problem" juror in the instant case was procedurally defective and requires reversal of the defendant's convictions. No hearing was held and no findings establishing "good cause" were made. A juror's mere assertion of inability to abide by his oath does not establish the "good cause" required by the statute. Representations of the kind made in this case by the problem juror or the other jurors may be mere euphemisms for the truth: that the juror was persistent in asserting a minority position during deliberations.[5] The judge refused to conduct further inquiry because he thought it "clear that the juror was emotionally or psychologically ill to such an extent that his service as a deliberating juror was wholly inappropriate." In an appropriate case, after an appropriate hearing and on the basis of appropriate findings, a judge may be in a position to conclude, without the assistance of medical experts, that a juror has a mental or emotional aberration, personal to the juror and unrelated to the merits of the case or the jury's deliberations, and that there is, therefore, good cause to discharge the juror. However, in the instant case, no adequate findings of emotional or psychological illness were made. "[T]he trial court has at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demon-

---

[5] In most circumstances it may well be a mistake for the judge to conduct a personal interview with a juror, based on messages of alarm from the jury room. A more orthodox approach would be to decline to take at face value any message which does not describe difficulties which are personal to a juror, and to treat the problem as one of a deadlocked jury. If the passage of time and the messages from the jury indicate that they are locked in disagreement, then the judge can give a carefully drawn supplementary charge to the entire jury, in accordance with progeny of *Commonwealth* v. *Tuey,* 8 Cush. 1 (1851). See *Commonwealth* v. *Jones, supra; Commonwealth* v. *Brown, supra; Commonwealth* v. *Rodriquez, supra.*

strable reality." *People* v. *Collins,* 17 Cal. 3d 687, 696 (1976), cert. denied, 429 U.S. 1077 (1977), quoting *People* v. *Compton,* 6 Cal. 3d 55, 60 (1971). With the exception of the juror's assertion of inability to abide by his oath, all the information on which the judge based his conclusion that the juror was ill *was known to the judge the day before the jury began their deliberations,* when the judge concluded that the juror's behavior was an "attempt to have himself excused from service" and that "discharging him was not warranted." The discharge of the juror without a hearing and without facts on the record which support a conclusion of mental illness or other good cause violates the statute. This error requires reversal of the defendant's convictions.[6]

3. *Other Alleged Errors.*

We turn now to several other issues argued by the defendant. Error appears in some of these areas. Because, as shown above, a new trial is required on two distinct grounds, we need not determine here whether these additional matters, separately or in combination, would themselves necessitate reversal. Nevertheless, some of these constitute additional reasons for concluding that fairness requires a new trial. We discuss these matters also because some or all of them may be at issue in any new trial of these indictments.

a. *Questioning of jurors.* Certain questions addressed by the judge to prospective jurors assume serious proportions be-

[6] When defense counsel objected to the judge's failure to conduct further inquiry he specifically requested that the judge ask the juror whether his asserted inability to follow his oath was a consequence of a mistaken belief that he was required to believe the witnesses Sperrazza and Wazen. Such a belief could have resulted from the judge's erroneous questioning of the jurors and the prosecutor's misstatement of the law. See note 8, *infra.* Such an inquiry would be an inappropriate intrusion into the juror's understanding of the issues of the case. Nonetheless, defense counsel's theory is a not entirely implausible explanation of the juror's discomfiture. A juror who believes that he is compelled by his oath to give equal weight to the testimony of all witnesses is placed in an intolerable dilemma if he does not find the testimony of one or more of these witnesses credible. The defendant's emphatic objections to the prosecutor's argument, and later to the discharge of the juror, thus tend to revive and rehabilitate his claim of error in the judge's questioning of the prospective jurors, as to which the defendant did not adequately preserve his rights in the first instance.

cause, like the limitation placed upon the cross-examination of Wazen, they had direct impact upon one of the principal issues in the case: the credibility of Sperrazza and Wazen. Both Sperrazza and Wazen were participants in the Federal witness protection program and received substantial financial and other benefits thereunder. Prior to trial, a local television station aired a series, entitled "Witnesses for Hire," which featured Sperrazza, Wazen, and the defendant, and which took a critical view of the witness protection program. In addition, a national television program focusing on and criticizing the witness protection program was shown before trial. The judge quite properly questioned prospective jurors as to whether they had seen the television programs. The judge went on, however, to ask some prospective jurors who had not seen the television programs whether the fact that a witness had received benefits under the witness protection program would affect the juror's assessment of the witness's credibility. In addition, the judge asked them whether the fact that a witness was a participant in the crime would affect the juror's assessment of the witness's credibility.

We agree with the defendant that this questioning improperly invaded the province of the jury. A witness's receipt of benefits under the witness protection program and his participation in the crime are highly relevant to his credibility and entirely appropriate for the jury's consideration.[7] The Commonwealth's case depended heavily on the testimony of Sperrazza, who both participated in the crimes and was in the witness protection program. Four prospective jurors were excused on the basis of the questioning. Moreover, the questioning itself clearly conveyed a message to the jury that they should not consider matters that they were entitled to consider. The problem was compounded by the prosecutor's misstatement of the law during closing argument, in which he told the jury that they had sworn

[7] Contrary to the Commonwealth's argument, neither participants in the witness protection program nor participants in the crime are "classes" within the meaning of G. L. c. 234, § 28. See *Commonwealth* v. *Shelley,* 381 Mass. 340, 353 n.11 (1980).

to treat the testimony of the witnesses equally,[8] and it is plausible to assert that the erroneous questioning and argument may have been a contributing cause of the discharge of a deliberating juror, as discussed *supra.*

When the prospective jurors were being questioned, defense counsel expressed his "fear" that the judge was "sending these jurors out of here with the view that they must get into that jury box and not let participation in the alleged crime or participation in the Witness Protection program be used by them on the issue of credibility when, indeed, it is highly admissible on that issue and should be considered by them on that issue," but he did not object to the questioning. He did, however, object to the prosecutor's closing and he moved for a mistrial on that basis. Because the defendant did not object at the time of the questioning, and because, near the end of the trial, the judge gave instructions which arguably were curative,[9] the

---

[8] The prosecutor's statement was as follows: "I told you at the outset of my opening that the Commonwealth relied on Sperrazza and Wazen, and before you were selected and each one of you were sworn and agreed by the answers that you gave to the judge to be selected as a juror, you were told that witnesses would be in the Federal Witness Protection Program, and you answered under oath that you would give their testimony equal weight, as much as any other witness that came and testified. You were also asked about participants in crime, and each and every one of you answered to the judge, on the record, that you could consider that testimony and give it equal weight, whether any other testimony was coming from any other such person. So you knew that from day one, before you were selected."

[9] During his charge the judge instructed the jury as follows: "Now, you may consider and give such weight, if any you see fit, that certain witnesses have received protection and financial and other benefits under the federal government's Witness Protection Program. You've heard a considerable mass of evidence in regard to that. It's for you to determine what effect, if any, what weight, if any, you will give to that situation in regard to any particular witness.

"A witness is not incompetent to testify because of participation in the crimes charged. You may consider the fact of participation in considering the person's testimony to whatever extent you see fit."

At the bench conference following the charge, the defendant requested a further instruction to the effect that the testimony of a participant in a crime or of a witness who testifies for personal advantage must be received by the jury with great caution. The judge declined to give this instruction, but instead told the jury: "You remember in my early, early discussions with

error would probably not in itself constitute ground for reversal. Nonetheless, some lingering effect of the judge's implicit erroneous admonition may have influenced the jury's assessment of Sperrazza's credibility and thus their determination of the defendant's guilt.

b. *The Commonwealth's failure to disclose.* It was crucial to the Commonwealth's case to establish that the defendant ordered the murders of Spinney and Webster and instructed Sperrazza and Stokes as to the method to be used. A police report produced to the defendant indicated that Sperrazza had said that the defendant had instructed him to insert a screwdriver into Spinney's temple and twist it. The trial testimony of the medical examiner, however, indicated that the bone of Spinney's temple had been penetrated in a fashion consistent with use of a screwdriver, but that there was no sign of rotation. Sperrazza testified that he had stabbed Spinney in the temple with the screwdriver but that, although he had been instructed to do so, he had not twisted it, and that he did not recall having told anyone that he did twist it. After trial, the defendant obtained a copy of a memorandum from the prosecutor in which it was clearly stated that Sperrazza had told one of the prosecutors that he had twisted the screwdriver. There was thus a substantial discrepancy, undisclosed to the defendant, between Sperrazza's trial testimony (which was consistent with the medical evidence) and his pretrial statement (which was not).

The prosecutor's memorandum, although not exculpatory on its face, became exculpatory in the context of Sperrazza's

---

you over in the church hall and here in the court, we had what I thought was a rather extensive discussion over there about jury duty, and then an extensive voir dire when I asked you questions here. It may be that in going into certain matters, such as the Witness Protection Program, that I emphasized one thing more than another. That wasn't done with any reason other than to examine you to see how we could get the 16 best qualified people for jury duty, which I'm satisfied we've done. But those earlier instructions and voir dire was merely preliminary in the very preliminary sense. And you will take the law in regard to these cases as I have just given it to you, and not discuss or be concerned with any questions that I asked you in regard to your qualifications to sit on the case or those preliminary instructions." The defendant objected to the judge's failure to give the requested instruction.

testimony that he did not recall having told anyone that he had twisted the screwdriver. The memorandum should have been produced to the defendant at that time. Moreover, the prosecutor had a duty to correct the false impression created by Sperrazza's testimony. Although it could have been "the truth, as he knew it," *Commonwealth* v. *Mercado,* 383 Mass. 520, 525 (1981), Sperrazza's answer was evasive; there was a substantial possibility that he was prevaricating.

In light of the Commonwealth's somewhat unusual theory of the case — that the defendant did not physically participate in the murders of the two women, but stood by and orchestrated the killings — substantial inconsistency in Sperrazza's description of that "orchestration" was not a trivial matter. We note that the prosecutor's nondisclosure seems to have been a consequence of nonculpable oversight, which is not surprising, given the complexity of the case and the vigor with which it was tried. But the fact remains that, fault regardless, a major source of impeachment of a major witness was not made available to the defendant.

The defendant argues nondisclosure in a second context. The terms of the agreement under which Sperrazza cooperated with the Commonwealth were set forth in a letter from Sperrazza's attorney to an assistant district attorney. The letter, which was produced to the defendant, is ambiguous as to whether the Commonwealth agreed not to use against Sperrazza information regarding crimes involving the defendant but not specifically mentioned in the letter. It is possible that Sperrazza interpreted the agreement as applicable to the murder of John Stokes in M.C.I., Walpole in 1976, to which he confessed, implicating the defendant. It can be argued that the composite knowledge of, on the one hand, the prosecutor in the instant case, and on the other, the assistant district attorney to whom the letter was addressed, included information that might have reflected on Sperrazza's state of mind with respect to his liability to prosecution for Stokes's murder. If fully disclosed, this information might have opened opportunities for effective cross-examination of Sperrazza on the issue of bias. We need not discuss further whether the prosecution had a duty to dis-

close this information or whether failure to do so would constitute another ground for reversal. The defense now has the relevant information and counsel can adequately assert the defendant's rights at any retrial.

c. *Other issues likely to arise on retrial.* Because the following issues have been addressed by the parties and are likely to arise again on retrial, we discuss them briefly. The defendant wished to question Wazen as to whether she had asked law enforcement officials to get her boy friend transferred out of M.C.I., Walpole. The judge ruled this inquiry collateral and excluded it. This ruling was correct. The defendant's proposed questioning was based on a tape recording of an interview of the witness by law enforcement agents, conducted more than two years before the trial, in which the witness had asked for intervention on behalf of her boy friend in return for her cooperation. There was no indication that anyone had in fact interceded for the boy friend or that the witness still hoped that anyone would. Thus, although the proposed questioning was relevant to the witness's motive in cooperating with law enforcement officials in the past, it was only remotely relevant to her motive in testifying at trial.

The defendant claims prejudice as a consequence of the trial judge's failure to exclude reference to his prior incarceration. There was no error. Although references to prior incarcerations obviously suggest that a defendant has been previously convicted of other crimes, such references are admissible if otherwise relevant, unless their probative value is substantially outweighed by their potential prejudicial effect. See, e.g., *Commonwealth* v. *Walden,* 380 Mass. 724, 732 (1980); *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973). The evidence was relevant to show the relationship between the defendant and Sperrazza. See *Commonwealth* v. *Sawyer,* 389 Mass. 686, 697-698 (1983). It was also essential to show the defendant's motivation in revealing the location of the bodies, which was "inextricably intertwined" with the crimes and a necessary part of the Commonwealth's presentation of a full picture of the events in issue. See *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 268-270 (1982); *Commonwealth* v. *Chalifoux,*

*supra* at 816. In the absence of a request by the defendant, the judge was not required to give a limiting instruction. *Commonwealth* v. *Bradshaw, supra* at 270. See *Commonwealth* v. *Sawyer, supra* at 696-698.

The prosecutor's characterizations of the defendant, in closing argument, as "the master manipulator," "the mastermind," and "the schemer," were adequately supported by the evidence and thus permissible. *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 402 (1975). The prosecutor's reference to the defendant as "the man that you've observed here for seven weeks, writing, writing and writing," was a reference to the defendant's courtroom appearance and was not improper. *Commonwealth* v. *Borodine*, 371 Mass. 1, 11 (1976), cert. denied, 429 U.S. 1049 (1977). However, the prosecutor's statement that any friction between law enforcement agencies (the existence of which might have been inferred by the jury from the fact that lawyers from the offices of the Attorney General and of the district attorney for the Norfolk district testified as witnesses for the defense) had been brought about by the defendant was entirely unsupported by the evidence and thus improper.

4. *The Validity of the Indictments.*

There was no error in the judge's denial of the defendant's motions to dismiss the indictments. The grand jury that returned the indictments against the defendant heard the testimony of one Clifford Kast, regarding a Cadillac automobile. The Cadillac, which was registered to Kast, was seen leaving the scene of the Roslindale bar shooting and was apparently used in the disposal of the bodies of Spinney and Webster. Kast told the grand jury that, although he knew that the car was to be used by Sperrazza and Stokes, he barely knew them and he registered the car as a favor to the defendant, who accompanied him to the registry and paid him $50 for his trouble. In prior judicial proceedings Kast had testified that he registered the Cadillac as a favor to Sperrazza and Stokes, that only Sperrazza and Stokes accompanied him, and that Sperrazza gave him the $50. At trial Kast reverted to his original story and stated that he had perjured himself before the grand jury.

The Commonwealth asserts that the story Kast told to the grand jury was the truth, and there is nothing in the record, other than a denial by a perjurer, to belie that assertion. We decline to assume that Kast's grand jury testimony was perjury, but it is clear that his prior inconsistent testimony was important as exculpatory evidence. The Commonwealth does not deny that the prosecutor who conducted the grand jury proceeding was aware of Kast's prior inconsistent testimony. Thus we must decide whether the prosecutor had a duty to present this exculpatory evidence to the grand jury and, if so, whether that duty was fulfilled.

A prosecutor is not required to present all possibly exculpatory evidence to a grand jury. But a prosecutor cannot be permitted to subvert the integrity of grand jury proceedings by "selling" the grand jury "shoddy merchandise" without appropriate disclaimers. *Commonwealth* v. *St. Pierre,* 377 Mass. 650, 655 (1979). See *Commonwealth* v. *O'Dell, ante* 445 (1984); *Commonwealth* v. *Salman,* 387 Mass. 160, 166-167 (1982); *Commonwealth* v. *Dilone,* 385 Mass. 281, 284 (1982). Where, as here, evidence known to the prosecutor would greatly undermine the credibility of an important witness, the prosecutor must at least alert the grand jury to the existence of that evidence. If the grand jury were not made aware of circumstances which undermine the credibility of evidence that is likely to have affected their decision to indict, then the appropriate remedy may be dismissal of the indictment. Cf. Arenella, Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication, 78 Mich. L. Rev. 463, 565 (1980).

The Commonwealth does not seriously argue that Kast's testimony was unlikely to have affected the grand jury's decision to indict. Of the witnesses whose testimony implicated the defendant, Kast was obviously the least likely to be biased against him. Moreover, as the Commonwealth emphasized in oral argument, the defendant's alleged involvement in the registration of the automobile and his consequent fear of being implicated in the crimes at the Roslindale bar provided the motive for his alleged participation in the murders.

Nonetheless, the drastic remedy of dismissal of the indictments is not required because the grand jury were made aware of Kast's prior inconsistent testimony. Kast stated to the grand jury that he had previously told a different story as to who had paid him to register the Cadillac.[10] In addition, the prosecutor's questioning implied that Kast had testified differently before.[11] Although Kast did not admit to any inconsistency, his answer was sufficiently evasive as to alert the grand jury to his doubtful credibility. In the circumstances, the prosecutor minimally fulfilled his duty to alert the grand jury to the existence of important exculpatory evidence.

*Judgments reversed.*

*Verdicts set aside.*

NOLAN, J. (dissenting). I dissent. The court has found reversible error in the trial judge's limitation of cross-examination of Diane Wazen and the discharge of a deliberating juror.

I agree that the judge should have permitted a wider search for Wazen's possible bias, but the court has gone down a perilous path in concluding that it was reversible error. The court has to strain to reach this conclusion in light of the impeachment of Wazen by criminal records and the exposition of her possible bias by showing the benefits which she received under the Federal witness protection program. These factors

---

[10] The colloquy was as follows:
Q: "Anybody give you any money for registering the car?"
A: "When I got in the car and passed the plates over either Myles or Tommy Sperrazza . . . I don't think it was Tommy. I think it was Myles although in the past I have said it was Tommy. I think it was Myles that passed the money to me. He said 'here's something for your time.' "

[11] The colloquy was as follows:
Q: "And what is your story today . . . what you have testified to? Is that the truth."
A: "Yes."
Q: "How about when you testified at previous times. Did you testify truthfully?"
A: "As I remembered it. You go back five years . . . at the trial their questions weren't deep and penetrating . . . just who I gave the car to."

were significantly absent from the cases cited as authority by the court for its holding today. They make a substantial difference.

The court also reverses because the judge discharged a deliberating juror. More particularly, the court holds that no good cause has been shown under G. L. c. 234, § 26B, for discharging the problem juror. I find this impossible to accept.

The judge first learned of a problem on the eleventh day of trial when the foreman sent him a letter relating complaints about the problem juror's eccentricities. The judge told counsel about the letter and spoke to the juror. He admonished the juror. The judge continued to receive reports critical of the problem juror, who refused to speak to the other jurors and threatened to refuse to deliberate. The problem juror's father was so apprehensive about his son's capacity to function as a juror that he asked an attorney to convey this to the judge. A woman, purporting to be the mother, called the judge to complain about the juror's service. It would have been better practice for the judge to make counsel privy to these contacts, but no harm accrued from the nondisclosure.

Again, as the trial approached the end, the judge was told that the juror indicated that he would not deliberate. In the lobby, he confronted the juror, who told him that he preferred not to deliberate because of a personality clash with the other jurors. The judge told counsel of his encounter. Defense counsel asked that the juror not be excused. The prosecution argued for his discharge. The judge indulged defense counsel and did not discharge the juror.

After the jurors had deliberated about eleven hours, the foreman sent a note to the judge advising him that a "particular juror says he cannot keep the oath." After the problem juror was brought to the lobby, in the presence of counsel, the judge read the oath and asked him whether he would keep it. The juror said he could not. He was discharged.

The court today says that there should have been a hearing before discharging the juror. For what purpose? The judge and counsel knew full well the weaknesses of the problem juror. He had been questioned by the judge on earlier occasions. The

defendant was made fully aware of the emotional difficulties of the juror. There is nothing to indicate that the judge discharged the juror to avoid a deadlocked jury. Nor is there any indication that the juror was unduly influenced by any impropriety in the prosecutor's closing argument.

In a word, the problem juror understood his obligation but he was not competent to fulfil it. The judge went to great lengths to preserve the integrity of the panel. The notion that this juror alone would have prevented convictions is the wildest speculation.

As to the other alleged errors on which the court does not rely in ordering a new trial, I see nothing which is so prejudicial as to require a new trial.