The defendant, Vincent A. Tiscione, III, was convicted by a jury in the Superior Court on two counts of possession of a firearm without a firearm identification (FID) card in violation of G. L. c. 269, § 10(h )(1) ; two counts of possession of ammunition without an FID card in violation of G. L. c. 269, § 10(h )(1) ; and two counts of failure to secure a firearm in violation of G. L. c. 140, § 131L(a ), (b ). At a subsequent jury-waived trial, a Superior Court judge convicted the defendant on four counts of having committed the firearm and ammunition offenses after a prior conviction of a violent crime or serious drug offense, subjecting him to enhanced penalties under G. L. c. 269, § 10G(a ). The defendant appeals from his convictions. The defendant maintains four arguments on appeal: (1) the judge abused his discretion in discharging a deliberating juror; (2) the judge erred in admitting evidence of the defendant's prior bad acts; (3) the prosecutor's closing argument improperly argued facts not in evidence to bolster the charge of constructive possession, playing to the sympathies of the jury; and (4) the judge erred in denying the defendant's motion for required findings of not guilty because there was insufficient evidence to prove he had constructive possession of the firearms. We affirm.
Background. 1. Factual background. The jury could have found the following facts. The defendant was dating Trisha Gain and both were living in Dorothy Gain's[2] apartment. Trisha's three children, Trisha's siblings, Ashleigh and Tabitha, and Ashleigh's two children also resided in Dorothy's apartment. A few weeks prior to June 28, 2013, Trisha was arguing with one of Dorothy's friends, Dennis Berry, in the living room of the apartment. The defendant told Berry to move away from Trisha. When Berry did not comply, the defendant went to the bedroom that was known as his and returned to the living room with a shotgun and pointed it at Berry. After the argument ceased, Dorothy observed the defendant place the shotgun under a mattress in his bedroom.
A few days before June 28, 2013, the defendant's friend, Shawn Michaels, arrived at the apartment with a firearm secured to his waist. Michaels entered the defendant's bedroom. Thereafter, Dorothy entered the defendant's bedroom and observed the defendant in possession of the handgun. The defendant placed the handgun in the bedroom closet. Dorothy told the defendant that she hoped the handgun would "not stay[ ] here," to which the defendant responded that he would get rid of it.
On June 28, 2013, Trisha and Ashleigh were arguing in the apartment. Trisha and the defendant left the apartment, and Dorothy, concerned for safety, used a key to enter the defendant's bedroom and retrieve the handgun from the closet. She located the handgun that the defendant placed in the closet but was unable to locate the shotgun she previously observed the defendant place underneath the mattress. Dorothy put the handgun in a grocery bag with the defendant's identification card and hid the bag containing both items in a hole in one of the walls of the apartment. The defendant and Trisha returned to the apartment, and Trisha and Ashleigh began arguing again. Dorothy called the police as the argument progressed. Prior to the police arriving, Dorothy overheard the defendant tell Ashleigh that "[h]e was going to shoot her and the kids and come back and rape their corpse."[3] The defendant then asked, "Where's my gun? Where my F-ing gun?" Dorothy observed the defendant searching the bedroom closet for the gun. Prior to leaving the apartment with Trisha, the defendant stated, "I'll be back, and you better find my F-ing gun." Ashleigh testified that in March, 2013, she sat with the defendant on a porch and he told her that he "got me some guns."
Upon the police arriving at the apartment, Dorothy showed the officers where she hid the defendant's handgun, i.e., in a hole in one of the walls of the apartment, and she informed the officers that there might be other guns in the home, namely the shotgun she observed the defendant place under the bedroom mattress. The officers secured the bedroom until a search warrant was obtained. Upon searching the bedroom, the officers recovered a box of .357 Magnum cartridges; a shotgun with twelve-gauge shotgun shells attached to it; and paperwork that had the defendant's name, including a driver's license,[4] a motel receipt, and a letter to the defendant from "Mass. DOT." The officers also located a black safe on a shelf inside the bedroom closet. A holster, knife, several boxes of ammunition of various calibers, and shotgun shells were located inside the black safe. A second safe was located in the closet. The second safe contained a credit card, health insurance card, and receipts with the defendant's name on them.
2. Jury deliberations. The jury's deliberations started on the second day of trial and lasted for about an hour before the jurors were dismissed for the day. Deliberations resumed on the third day, and after approximately an hour and a half the jury submitted two notes to the judge.[5] ,[6] After the judge instructed the jury on their questions, they resumed deliberations. Sometime prior to 2:00 P.M. , juror number forty-four removed herself from the deliberation room and told the court officer that she could no longer continue with deliberations. After refusing to rejoin the jury upon the judge's request, the judge halted deliberations. In the presence of both parties, the judge conducted two colloquies with juror number forty-four, during which the judge observed that the juror was "visibly upset." The juror explained to the judge that she was upset because she had several family health issues. The judge discharged the juror, determining that good cause existed because the juror "no longer ha[d] an ability to participate as a juror in this case."[7] The remaining jury and the alternate juror began deliberations anew at approximately 2:00 P.M. At approximately 3:30 P.M. , the jury reached a verdict for each charge.
Discussion. 1. Discharging a deliberating juror. "The discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error. It is to be done only in special circumstances, and with special precautions." Commonwealth v. Connor, 392 Mass. 838, 843 (1984). General Laws c. 234, § 26B,[8] and G. L. c. 234A, § 39, set forth the special circumstances in which a judge may discharge a deliberating juror. The Supreme Judicial Court has construed both statutes to permit dismissal "only [for] reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." Connor, supra at 844-845. See Commonwealth v. Sanders, 451 Mass. 290, 306 (2008), citing Commonwealth v. Francis, 432 Mass. 353, 367-369 (2000). "Allowing discharge only for personal reasons ensures that such action will not 'affect the substance or the course of the deliberations.' " Commonwealth v. Swafford, 441 Mass. 329, 336 (2004), quoting from Connor, supra at 845 n.4. "[A] judge must hold a hearing adequate to determine whether there is good cause to discharge [the] juror." Connor, supra at 843-844.
"At the hearing, the issues of the case and the juror's relationship to his fellow jurors are not to be discussed." Id. at 845. "If the 'problem' juror is questioned, the judge should preliminarily inform him that he cannot be discharged unless he has a personal problem, unrelated to his relationship to his fellow jurors or his views on the case. Unless the juror indicates a belief that he has such a problem, all questioning should cease." Ibid. (footnote omitted). "In an appropriate case, after an appropriate hearing and on the basis of appropriate findings, a judge may be in a position to conclude, without the assistance of medical experts, that a juror has a mental or emotional aberration, personal to the juror and unrelated to the merits of the case or the jury's deliberations, and that there is, therefore, good cause to discharge the juror." Id. at 846. "Finally, if and when a deliberating juror is discharged, the judge must instruct the remaining jurors 'not only to begin deliberations anew (see G. L. c. 234, § 26B ) but also that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or his relationship with his fellow jurors.' " Commonwealth v. Garcia, 84 Mass. App. Ct. 760, 767 (2014), quoting from Connor, supra at 845-846.
Here, the defendant argues that the judge's discharge of juror number forty-four was error because the juror's reason for refusing to continue with deliberations was not personal, and the juror's discharge affected the course of deliberations and substantially prejudiced the defendant. The defendant also argues that because the judge did not specifically ask the juror "whether her issue was entirely personal or if it was somehow related to the case," the hearing was procedurally defective. After close review of the record, we conclude that the judge followed the required discharge procedures, and the juror's personal issues were such that satisfied the good cause requirement.
During the hearing, the judge asked the juror, "I don't want to inquire about what you were deliberating about or what the issue was, but can you tell me in a general or generic sense as to why you didn't wish to go back in?" The juror responded that there were a couple of jurors "being argumentative" and that it was "enough to upset [her]," however, she did not feel threatened in any way. The juror stepped away and the judge, during discussions with both counsel, was not satisfied that the juror had a personal problem and that "[a]t least preliminarily, it sounds like" the juror's problem "relates to her views on the case." The juror was called back for further questioning during which she explained her mental state in more detail:
"Well, my dad has dementia, so I'm worried about him. My sister's husband has end-stage Alzheimer's, and she's meeting with an attorney today about the will. My husband had hip surgery a month ago. My daughter's father-in-law had open-heart surgery two weeks ago; and it's just a lot. I feel like I should be with family."
The juror went on to state, "I didn't think we would be here this long. I feel like I should be with my family; and the people in there-it's just arguing, and I'm uncomfortable." Such an explanation satisfactorily answered whether the juror's issue was entirely personal or if it was somehow related to the case. The judge determined, and we agree, that good cause existed to discharge the juror based on her "personal life experiences, the burdens in her life," and "her personal emotional state, given her life issues at present." Such emotional issues had overwhelmed her "beyond the level that often accompanies deliberations," causing her to no longer have the ability to participate as a juror. Garcia, supra at 768.
Furthermore, the judge properly instructed the remaining jury about starting deliberations anew and that juror forty-four's discharge was entirely personal. See Connor, 392 Mass. at 846 (jury must be instructed "that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or [her] relationship with [her] fellow jurors"). The defendant's claim that juror forty-four was in the minority view and that her "disagreement with other jurors about the verdicts" was the basis for her refusal to continue deliberations is without support in the record. The defendant relies on the jury's note to the judge, which was time stamped 11:35 A.M. and stated that it was deadlocked on two charges. This note, however, did not make it to the judge until after juror forty-four was discharged, and, in any event, did not indicate that juror forty-four was in the minority vote. We also disagree with the defendant's contention that the new jury did not begin deliberations anew because they reached a verdict after approximately an hour and a half of deliberations. The original jury had deliberated for a shorter amount of time on day two before almost reaching a verdict. There is no evidence to suggest that juror forty-four was in the minority vote or that the alternate juror might have felt " 'a substantial coercive effect' when joining [the] other jurors who already have agreed upon the guilt or innocence of the accused." Garcia, supra at 767, quoting from Commonwealth v. Olavarria, 71 Mass. App. Ct. 612, 619-620 (2008).
2. Evidence of the defendant's prior bad acts. The defendant argues that the admittance of prior bad acts evidence, i.e., Ashleigh's testimony that the defendant told her he "got [ ] some guns" and Dorothy's testimony that the defendant threatened Berry by pointing a shotgun at him, was an abuse of discretion. The defendant maintains that such evidence prejudicially portrayed him as a violent man who routinely threatened others with guns, "permitt[ing] the jury to consider his ownership not of the recovered firearms and ammunition, but of unrelated firearms." We disagree.
"Evidence of prior bad acts is not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as common scheme, pattern of operation, identity, intent, or motive." Commonwealth v. Oberle, 476 Mass. 539, 550 (2017). The judge must determine whether the probative value of the evidence outweighs any undue prejudice to the defendant. See ibid. In doing so, the judge must look at the connection between the evidence and the facts of the case as well as whether the evidence is too remote in time. See Commonwealth v. Keown, 478 Mass. 232, 244 (2017), cert. denied, 138 S. Ct. 1038 (2018). Here, the Commonwealth sought to introduce Dorothy's testimony that she observed the defendant point a shotgun at Berry and then place the shotgun under the mattress in the defendant's bedroom. The judge found, and we agree, that Dorothy's statements were "clearly relevant as a shotgun is one of the guns that the defendant is charged with having possessed illegally, and the shotgun was found in the defendant's bedroom." "[S]uch evidence was 'relevant as a link in tending to prove that the defendant committed' the crimes charged." Commonwealth v. McGee, 467 Mass. 141, 156-157 (2014), quoting from Commonwealth v. Perez, 460 Mass. 683, 695 (2011).
As for Ashleigh's testimony regarding the defendant's statement that he "got [ ] some guns," the judge found, and we again agree, that the testimony was admissible as a party admission. See Commonwealth v. Crayton, 470 Mass. 228, 246 n.22 (2014) ; Mass. G. Evid. § 801(d)(2)(A) (2018). Furthermore, the judge provided the jury with a limiting instruction regarding Dorothy's and Ashleigh's testimony.
3. Prosecutor's closing argument. The defendant argues that the prosecutor's closing argument contained facts not in evidence as an effort to bolster the charge for constructive possession, and that such statements warrant a reversal. The defendant did not object to the prosecutor's closing argument at trial, thus, we review any error for a substantial risk of a miscarriage of justice. See Commonwealth v. Loguidice, 420 Mass. 453, 455-456 (1995). We look at the challenged statements in light of the entire argument, the judge's instructions to the jury, and the strength of the evidence presented at trial. See Commonwealth v. Hrabak, 440 Mass. 650, 654 (2004). "[C]ounsel may argue the evidence and the fair inferences which can be drawn from the evidence," Commonwealth v. Hoffer, 375 Mass. 369, 378 (1978), however, "[c]ounsel may not refer to or suggest their knowledge of matters not in evidence," Commonwealth v. Hoppin, 387 Mass. 25, 30 (1982). Rather, counsel is allowed to try and "fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury." Commonwealth v. Ferreira, 381 Mass. 306, 316 (1980) (quotation omitted).
Here, the prosecutor stated that items, including clothes and shoes, shown in a photograph of the closet where the weapon was discovered "appears to be male shoes" and "male clothing." The prosecutor also stated that Dorothy "live[d] in fear of th[e] defendant and those guns." The defendant challenges those statements and how, in the defendant's view, the prosecutor "harp[ed] on the fact that [the defendant] threatened to shoot or harm Ashleigh or her kids." Such statements do not rise to the level of a substantial risk of a miscarriage of justice. The statements, if not referencing direct testimony of a witness, were permissible inferences drawn from witness testimony and other evidence. Furthermore, the judge provided a limiting jury instruction; we presume "[a] certain measure of jury sophistication," Commonwealth v. Kozec, 399 Mass. 514, 517 (1987), and that the jury will abide by the judge's instructions, see Commonwealth v. Pope, 406 Mass. 581, 588 (1990).
4. Motion for required findings of not guilty. We consider the evidence, together with permissible inferences from that evidence, in the light most favorable to the Commonwealth, to "determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Cordle, 412 Mass. 172, 175 (1992). See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). "Constructive possession requires proof of knowledge coupled with the ability and intention to exercise dominion and control." Commonwealth v. Dagraca-Teixeira, 471 Mass. 1002, 1004 (2015) (quotation omitted). "This proof 'may be established by circumstantial evidence, and the inferences that can be drawn therefrom.' " Ibid., quoting from Commonwealth v. Brzezinski, 405 Mass. 401, 409 (1989). Because the defendant had access to the bedroom, which was known as his, "it reasonably can be inferred that [he] had the 'ability' to exercise control over items located there." Ibid. It is also clear from Dorothy's and Ashleigh's testimony that the defendant had "knowledge" of the firearms and the "intention" to exercise control over them. Both Dorothy and Ashleigh testified that they observed the defendant in possession of the shotgun and that the defendant threatened to shoot Ashleigh and her children; Dorothy testified that she observed the defendant place the shotgun underneath the mattress in the bedroom, and that after Dorothy hid the handgun in a hole in the wall of the apartment, the defendant returned and asked "Where's my gun?" Reviewed under the Latimore standard, the evidence was sufficient to show that the defendant constructively possessed the firearms.
Judgments affirmed.

Dorothy is Trisha's mother. Dorothy, Trisha, Ashleigh, and Tabitha will be referred to by their first names since they share a surname.

Ashleigh also testified that the defendant made this statement and that the defendant motioned a "gun signal" at her.

The defendant's driver's license listed 25 Rawson Drive, Leicester, Massachusetts as his address.

The first note asked, "If we don't come to an agreement 12-0, by default do we, must we rule 'not guilty', or do we return a verdict of 'no vote'?" The second note asked, "If we cannot get 12-0, must we vote 'not guilty'? What is the problem if we vote for 6 before 2?"

The judge instructed the jury, and both parties agreed, that any verdict on each of the indictments must be unanimous and the indictments may be decided in any order.

The judge informed the jury that juror number forty-four was discharged for personal and private reasons unrelated to the case or deliberations. An alternative juror was selected and the jury were instructed to "begin [their] deliberations fresh with the new juror."

General Laws c. 234, § 26B, was repealed by St. 2016, c. 36, § 1, effective May 10, 2016. The defendant's jury trial was held before the statute was repealed.