COMMONWEALTH *vs.* GILBERTO TORRES.

Hampden. January 9, 2009. - May 5, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, & BOTSFORD, JJ.

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Deliberation of jury, Challenge to jurors, Judicial discretion, Mistrial. *Jury and Jurors. "School Zone" Statute.*

A criminal defendant failed to demonstrate that he suffered prejudice from any perceived deficiencies in his trial counsel's failure to use peremptory challenges to two jurors. [730-731]

A trial court judge did not abuse his discretion in denying a criminal defendant's motion for a mistrial based on a juror's allegedly irregular behavior, where the judge, in response to the foreperson's report raising the genuine possibility of a problem unique to the juror that might have constituted good cause for her discharge, interviewed the foreperson outside the presence of the other jurors and was scrupulous in attempting to steer the foreperson away from revealing any details of the deliberations; interviewed the juror both to determine whether good cause existed to discharge her and to ascertain her ability to deliberate fairly; and, when the jury returned with a nonunanimous verdict, acted within his authority in directing the jury to resume their deliberations. [731-737]

There was no merit to the argument of a criminal defendant convicted of distributing heroin in a school zone that the Commonwealth neglected to lay a proper foundation for testimony regarding the measurement between the scene of the drug transaction and the school. [737-738]

INDICTMENTS found and returned in the Superior Court Department on July 26, 2005.

The cases were tried before *Judd J. Carhart,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Andrew S. Crouch* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted by a Superior Court jury of distributing heroin in a school zone, and he pleaded guilty as a subsequent offender on the distribution charge. See

G. L. c. 94C, § 32 (*b*); G. L. c. 94C, § 32J. On appeal to the Appeals Court, he claimed that his trial counsel was constitutionally ineffective in failing to use peremptory challenges to remove two jurors; the judge abused his discretion in denying the defendant's motion for a mistrial based on a juror's irregular behavior; and the Commonwealth failed to establish the accuracy of the device used to measure the distance between the drug transaction and the school. The judgments were affirmed by a divided panel of the Appeals Court. See *Commonwealth* v. *Torres*, 71 Mass. App. Ct. 723 (2008). The dissenting judge departed from the majority on the question whether the trial judge erred in denying the defendant's motion for a mistrial. *Id.* at 735-736. We granted the defendant's application for further appellate review, and now affirm the judgments.

1. *Background.* a. *The crimes.* The evidence at trial permitted the jury to find that the defendant, acting in a joint venture with another man, sold heroin to an undercover police officer in front of the Lafayette Club, in Holyoke.[1] Police Officer Brian Duke measured 841.9 feet from the Lafayette Club to the Morgan Elementary School, using a "MeasureMaster roller tape," a device with two wheels and internal gears.[2] Although Officer Duke testified that he had never calibrated the device, he said that other officers had. One such officer was Daniel Riordan. He testified that, during the same month as the offenses in this case, he calibrated the MeasureMaster by using it to measure a known distance (thirty feet marked by a surveyor's tape) and that the device was accurate. (Neither officer demonstrated the device at trial.) Officer Riordan added that, on various occasions, not in connection with this case, he had measured the distance between the Lafayette Club and the Morgan Elementary School and found the distance to be fewer than 1,000 feet: in the "850 range." The defendant raised no objection to the testimony of Officer Duke or Officer Riordan.

b. *Jury selection.* At the beginning of jury selection, the clerk instructed the defendant that, if he wished to object to any of the jurors, he "must do so as they are called and before they are

---

[1]At trial the defendant pursued a misidentification defense.

[2]The school zone charge required proof that the drug transaction occurred within 1,000 feet of the school. See G. L. c. 94C, § 32J.

sworn. You have a right to challenge any six for no cause and as many others as you have good cause to challenge."[3] The judge sua sponte excused some of the prospective jurors for cause and then found the panel to be indifferent. Fourteen jurors were seated, and the Commonwealth said that it was satisfied.

Defense counsel then peremptorily challenged two jurors, who were dismissed and replaced; counsel did not use any of his four remaining peremptory challenges. Counsel then asked when he could raise challenges for cause, to which the judge said that it was too late to do so. Counsel explained that he wished to challenge for cause jurors no. 11 and no. 28 because they had family members employed in law enforcement. Despite the lateness of the request, the judge conducted individual voir dire of the jurors in question. Juror no. 11 said her husband used to be chairman of the board of selectmen and police commissioner "in town,"[4] but that those circumstances would not affect her ability to be fair; the judge seated the juror. Juror no. 28 confirmed that, although her father was a Chicopee police officer, that fact would not affect her ability to be fair to both sides; the judge seated the juror. Both attorneys said they were satisfied.

c. *Juror no. 14.*[5] After the attorneys gave their closing arguments and the judge gave his final jury charge, the prosecutor remarked to the judge at sidebar that she was "wondering whether [juror no.] 14 was focused." The judge commented, "[S]he did

[3]Rule 6 of the Rules of the Superior Court (2008), applicable to all cases, provides, in pertinent part: "[U]nless specially otherwise ordered in a particular case [t]he jurors shall first be called until the full number is obtained. If any examination on oath of the jurors is required, it shall be made, and any challenge for cause shall be acted on, and if any jurors shall be excused others shall be called to take their places. When it has been determined that all the jurors stand indifferent in the case, each plaintiff shall at one time exercise his right of peremptory challenge as to such jurors, and after others have been called to take the places of those challenged, and it has been determined that they stand indifferent in the case, shall at one time exercise his right of challenge of such others, and so on until he has exhausted his right of peremptory challenge or has ceased to challenge. Each defendant shall then exercise his right in the same manner."

[4]The juror did not identify the town, but defense counsel referred to it as "Bridgefield." On appeal, the Commonwealth refers to the town as Brimfield.

[5]The juror in question was identified during jury selection as juror no. 40, but she occupied seat no. 14 in the jury box. Because the parties refer to her as juror no. 14, so do we.

raise her hand during [defense counsel's] argument [but] I'm not going to do anything about the juror." The jury then left the court room to deliberate.

Approximately forty-five minutes later, the judge returned to the bench and told the attorneys that the foreperson had sent him a note, which read: "On this jury there is an individual unable to deliberate in a coherent and logical manner on this issue. I seek your guidance." The juror in question was later identified as juror no. 14. With the attorneys' agreement, the judge brought the foreperson into the court room, and after cautioning him against divulging anything about the jury's deliberations, the judge questioned him as follows.

*Q.*: "What is it that leads you to the conclusion [that juror no. 14] can't deliberate in a coherent, logical manner?"[6]

"..."

*A.*: "Police officers have offered evidence in court. Not — irrespective of that, [juror no. 14's] of the mind, because of past experience with police, that all police are bad, so it doesn't matter what they say, okay? Is that —"

*Q.*: "I really would like to cut you off. I don't want to hear what the juror's personal thoughts are."

*A.*: "I didn't tell you. I am just saying in her mind any police officer, no matter what he says, is bad, because of a prior contact with police. That's — and we can't get beyond that."

*Q.*: "Okay. Okay. All right."

*A.*: "And you want another example?"

*Q.*: "Well —"

*A.*: "She doesn't believe that is heroin because she can't see it —"

---

[6]Before the foreperson answered the judge, the judge again told him that it was "very important we not know the substance of deliberations."

*Q.*: "Let me interrupt."

*A.*: "— and anyone can sign that sheet."[7]

Q.: "I have to stop you. I want to say — stop. I asked
you not to tell me about the substance. I really don't
want to hear about the substance."

Shortly thereafter, the foreperson left the court room, and the
judge discussed the matter with the attorneys. A court officer
interrupted to say that, moments earlier, when he had gone to
the jury room to bring the foreperson before the judge, juror no.
14 said to the court officer, "Are you going to release me yet?
I'm going home yet?"[8] The judge thanked the court officer and
resumed his discussion with the attorneys.

With the attorneys' assent, the judge brought the jury back
into the court room, read them the foreperson's note, and rein-
structed them on their duties — urging them to give the case
their full and fair consideration, and to listen to each other's
opinions.[9] During those instructions, juror no. 14 raised her hand,
but the judge did not engage her in conversation; he told her

[7]Packets containing the drug evidence were admitted at trial with a certificate
of analysis showing that the packets contained heroin. The judge properly
instructed the jury that the certificate was prima facie evidence of the substance,
and that the jury were permitted, though not required, to conclude based on
the certificate that the substance was heroin. See G. L. c. 22C, § 39; G. L.
c. 111, § 13.

[8]There is no indication in the record that juror no. 14 was troubled by the
length of the trial, which lasted two days. During jury selection, the judge had
asked any juror for whom serving more than one day would pose a problem
to come forward; juror no. 14 did not do so.

[9]The judge instructed as follows: "The jury process is a time-tested process.
It's the manner in which we decide very important cases by taking twelve
disinterested people from different parts of this county, have them listen to
evidence, and have them deliberate in an effort to seek a verdict.

"In your deliberations, any time twelve people listen to anything, of course
there are going to be disagreements, and the process is such that by speaking
about the case and by being mindful of other people's opinions and voicing
your own opinion, that some collective wisdom can be reached.

"And so, having that in mind, I urge each of you, every juror, to give this
case your full, fair consideration, to speak to your other jurors, to listen to
them, and to engage in a dialogue. In other words, by 'dialogue,' I mean give
the other jurors your opinions and listen to other jurors' opinions. That's the
very essence of the jury system, and I remind you that this is an important

she could communicate with the court by submitting a written note. The attorneys said they were satisfied with the judge's instructions. The jury then resumed their deliberations.

A little more than one hour later, the judge informed the attorneys that he had received two notes: one from the foreperson and one from juror no. 14. The foreperson's note said:

> "Your Honor, we have a juror who feels the criminal justice system is corrupt. The juror cannot comprehend the evidence before them. The juror does not even want to be here and wants to be excused. We are not trying to sway the decision of this juror. However, this person cannot agree to the writing on the State [of] Massachusetts documents. We feel that the two alternate jurors, either one, can understand the evidence before us. We ask that the alternate juror who can comprehend the evidence be swapped with this juror in question."

Juror no. 14's note said:

> "I don't want to stay on the jury [incomprehensible writing]. Not guilty, I want to go home. May I never go through this again. Now I got to, got to — home. Guilty. So I bring in — so I bring in to go home."

The prosecutor, concerned that juror no. 14 was biased against the police witnesses, moved that the juror be removed, pursuant to G. L. c. 234A, § 39, and *Commonwealth* v. *Swafford*, 441 Mass. 329, 337-338 & n.9 (2004), and cases cited (inability of juror to be impartial can constitute basis for discharge).[10] Defense

---

case to all parties, and they are relying on you as the conscience of this community to be conscientious and to be fair to both parties, and give this your full, fair consideration by engaging in a dialogue, by listening to fellow jurors and making your view known."

[10]General Laws c. 234A, § 39, provides, in pertinent part: "The court shall have the discretionary authority to dismiss a juror at any time in the best interests of justice. . . . The court shall have authority to excuse and discharge a juror participating in jury deliberations after a hearing only upon a finding of an emergency or other compelling reason." Similarly, G. L. c. 234, § 26B, provides, in pertinent part: "If, at any time after the final submission of the case by the court to the jury and before the jury has agreed on a verdict, a juror dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged and [replaced with an alternate]." See Mass. R. Crim. P. 20 (d) (3), 378 Mass. 889 (1979).

counsel vigorously objected, suggesting the judge conduct a voir dire of juror no. 14 to determine whether she could be fair and impartial. The judge, acknowledging the perils of interviewing the juror (he noted that the foreperson had earlier disclosed some details of the deliberations), decided to question juror no. 14. The judge said, "[W]e are all here to see that justice is done," and stated that the notes from the jury indicated there was a question about juror no. 14's ability to be impartial.

After calling juror no. 14 into the court room and instructing her not to divulge any information about the jury's deliberations, the judge questioned her as follows.

> *Q.:* "I want to know whether or not you would have some difficulty in being fair to both sides, the prosecution and the defendant."
>
> *A.:* "Well, I will tell you what, between the evidence and everything else, I don't agree with them."
>
> *Q.:* "That's perfectly all right. I don't want to know what the discussions are or what you think about this case, but is there some — is there anything in your mind that says you could not be fair to both sides?"
>
> *A.:* "I've tried, yeah."
>
> *Q.:* "Do you have some — do you remember when I asked you about whether you would believe or disbelieve a police officer just because they are police officers? . . . I asked you at the outset of the case whether you would believe or disbelieve police officers just because they are police officers."[11]
>
> *A.:* "Oh, I don't."
>
> *Q.:* "You don't what?"
>
> *A.:* "I don't believe — I don't believe the true or the

[11]During the judge's preliminary questioning of the jury venire, he asked, among other things: "If any juror would tend to believe or disbelieve a police officer against a civilian just because they're police officers, I ask you to come forward and discuss that view with me." None of the jurors came forward.

false. I decide it for myself, because there is good and bad in every profession."

The judge then thanked the juror and asked that she leave. After the juror left the court room, the prosecutor asked that the juror be discharged. Defense counsel disagreed, saying that "her response shows that she has not prejudged the situation. Despite what somebody else said about what she was thinking or saying, she's indicating there is good and bad in both professions, and she's trying to take the matter seriously and consider the issues." The judge concluded, "I don't see how, on this evidence, I discharge her." The prosecutor then said she was concerned that the juror's "desire to leave is so strong that she would say anything, guilty, not guilty. It's as if she doesn't care." The judge then brought juror no. 14 back into the court room for more questioning.

> *Q.:* "Part of your note says pretty strongly you want to go home."
>
> *A.:* "Yes."
>
> *Q.:* "And I understand that. I'm going to say I am probably not going to let you go home. I want to make sure you will still not compromise your view on this case because you want to go home. Do you understand what I'm saying?"
>
> *A.:* "In other words, if I find the young man not guilty because knowing there is good and bad in every profession, but they all find him guilty?"
>
> *Q.:* "I do not want to know what they say and what you say. I want to know your desire to go home is not going to somehow overcome your ability to be a good, fair juror."
>
> *A.:* "No, sir. I want the truth on the paper, sir."

After excusing the juror, and without further discussion with counsel, the judge said, "I'm going to leave her on the jury," noting for the record that he found that her desire to go home would

"not overbear her ability to continue to deliberate and have her view made known to the other jurors, whatever that view may be." The judge then brought the jury back in and instructed them to continue their deliberations.[12] The defendant lodged no objection.

Approximately forty-five minutes later, the jury returned to the court room, ostensibly with unanimous verdicts. The foreperson read the verdicts — guilty on the heroin distribution and school zone charges — but when the clerk sought to record the verdicts, asking the jurors as a group whether the verdicts were unanimous, all of the jurors except juror no. 14 answered "Yes." The judge then asked juror no. 14 to state her verdict, to which she responded, "Not guilty."

The judge directed the jury to leave the court room, noting for the record that the jury had not reached unanimous verdicts, and that he was going to instruct them to resume their deliberations. Defense counsel moved for a mistrial. When questioned by the judge as to his reason, counsel replied, "I would suggest that, at this point, they are not going to reach a verdict." The judge said, "You don't know that," and denied the motion. The judge brought the jury back into the court room, instructed them that a unanimous verdict was necessary, and sent them back to resume their deliberations.[13] Approximately one-half hour later, the jury returned to the court room, this time with unanimous verdicts finding the defendant guilty on the heroin distribution and school zone charges, the judge making inquiry of each juror separately.

2. *Discussion.* a. *Ineffective assistance of counsel.* The defend-

----

[12]The judge told the jury: "Ladies and gentlemen, I have two separate communications from the jury, one from the foreperson, and one from an individual juror, and I have heard concerns raised from each of these communications with the attorneys. And I have considered it, and I am simply going to ask you to continue your deliberations."

[13]The judge instructed the jury: "Ladies and gentlemen, the law requires that the verdict of the jury be recorded. Before it can be recorded, it must be unanimous. That means that each juror must agree on the verdict before it may be recorded, and the process we have is by inquiring of the jurors if a verdict is unanimous. Each juror must answer in the affirmative, before that can be recorded.

"That did not happen, so a conclusion on my part, there is not a unanimous verdict. I ask you please to resume your deliberations."

ant claims that his counsel's failure peremptorily to challenge jurors no. 11 and no. 28 — either before or after unsuccessfully challenging them for cause — cost him an impartial jury, thus demonstrating constitutional ineffectiveness. See *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). We disagree.

Although a defendant may use a peremptory challenge to remove a juror with familial connections to law enforcement, see *Commonwealth v. Green*, 420 Mass. 771, 774, 778 (1995) (defense counsel's explanation that juror's father and brother were police officers adequate to justify peremptory challenge), such familial connections by themselves raise no presumption of bias. See *Commonwealth v. Murphy*, 59 Mass. App. Ct. 571, 581 (2003) ("the mere fact that a juror knows a police officer or prosecutor, or is related to them, does not disqualify a juror from service or show any bias"). See also *Commonwealth v. Ascolillo*, 405 Mass. 456, 460-461 (1989) (police officers not disqualified from serving on juries solely because of professional status); G. L. c. 234A, § 3. Moreover, on inquiry by the judge at the instigation of defense counsel, jurors no. 11 and no. 28 stated that they could be impartial, the judge accepted those representations, see *Commonwealth v. Leahy*, 445 Mass. 481, 499 (2005) (judge may accept juror's representation of impartiality absent "solid evidence of distinct bias"), and defense counsel confirmed that he was satisfied. See *Commonwealth v. Mello*, 420 Mass. 375, 396 (1995) (no ineffective assistance where, although counsel failed peremptorily to challenge jurors with relatives involved in law enforcement and firefighting, jurors said they could be impartial and counsel was satisfied). Accord *Commonwealth v. Duran*, 435 Mass. 97, 107 (2001). The defendant has failed to show that he suffered prejudice from any perceived deficiencies in his counsel's performance.

b. *Motion for a mistrial.* The defendant argues that the jury became deadlocked, hopelessly so, by the time they returned their nonunanimous verdict. He further claims that "any verdicts returned thereafter were likely to be the result not of a unanimous jury as required, but of juror no. 14's acquiescence and submission to the will of the others so that she could . . . go[] home." He thus faults the judge for denying his motion for a mistrial. In denying the defendant's motion, the judge was acting within

his discretion. See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006). Thus, we ask not whether we would have made a different decision from that of the judge, but whether "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976), quoting *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920). Reversal for abuse of discretion is rare, particularly where, as here, the matter hinges on the judge's evaluation of the demeanor of members of the jury whom he interviewed individually. See *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000) ("[T]he experienced judge was in a superior position to observe and assess the juror's demeanor on voir dire. We will not disturb this assessment on appeal"). We conclude there was no abuse of discretion.

Relying principally on *Commonwealth* v. *Connor*, 392 Mass. 838, 842-847 & n.5 (1984), the defendant argues that the jury initially became deadlocked when the foreperson sent his first note to the judge, and that the judge should not have interviewed the foreperson. We disagree. The problem in the *Connor* case was that the judge discharged a juror without holding a hearing or making findings to determine whether there was "good cause" to do so, under G. L. c. 234, § 26B — i.e., whether there were "reasons personal to [the] juror, having nothing to do with the issues of the case or with the juror's relationship with his fellow jurors." *Id.* at 844-845. This court concluded that a juror's assertion of his inability to abide by his oath alone did not establish good cause. See *id.* at 846. In addition, the court cautioned that similar assertions could be "mere euphemisms" for holding a minority position, and thus emphasized the importance of holding a hearing before discharging a juror. See *id.* at 843, 846 ("Great care must be taken to ensure that a lone dissenting juror is not permitted to evade his responsibilities"). The emphasis on the need for a hearing was tempered, however, with a warning about the perils of invading the province of the jury. See *id.* at 844-846 & nn.3 & 5, citing *Commonwealth* v. *Webster*, 391 Mass. 271, 275-276, 277 (1984) (judge improperly indicated he disagreed with juror on evidence); *Commonwealth* v. *Hebert*, 379 Mass. 752, 755 (1980) (same). In light of those perils, the court noted, "In most circumstances it may well be a mistake for the judge to conduct a

personal interview with a juror, based on messages of alarm from the jury room. A more orthodox approach would be to decline to take at face value any message which does not describe difficulties which are personal to a juror, and to treat the problem as one of a deadlocked jury [for which a *Tuey-Rodriquez* charge may be appropriate, see *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 (1851), and *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A)]." *Commonwealth* v. *Connor, supra* at 846 n.5. The defendant relies principally on this footnote in arguing that the foreperson's note indicated the jury were deadlocked, and that the judge should not have interviewed him. The defendant's claims are unavailing.

The judge reasonably treated juror no. 14's reported inability to deliberate coherently and logically not as a "mere euphemism" for the assertion of a minority position; the report raised the genuine possibility of a problem unique to the juror that might have constituted good cause for her discharge. See *Commonwealth* v. *Swafford*, 441 Mass. 329, 335, 337 (2004) (where foreperson reported juror "doesn't think she can[] work through the case," and court officer reported juror said she was not participating in deliberations and wanted to leave, judge interviewed foreperson and juror; judge properly discharged juror because of her reclusive behavior and repeated statements that she could not be fair and impartial); *Commonwealth* v. *Leftwich*, 430 Mass. 865, 872-874 (2000). That the foreperson's note came only forty-five minutes into deliberations further made it "unlikely that the jury were at an impasse." *Commonwealth* v. *Francis, supra* at 369. The judge cannot be faulted for seeking to find out more about juror no. 14's problem, particularly where he did so with the assent of both attorneys.[14] See *Commonwealth* v. *Webster, supra* at 277 (where judge was informed of "problem" with juror, judge "should have placed more information on the record concerning that communication and should have permitted counsel to express their views on what procedure to follow in view of the sensitive nature of the 'problem' ").

---

[14]The judge interviewed both the foreperson and juror no. 14. He might better have investigated the problem with juror no. 14 by interviewing her rather than interviewing the foreperson in the first instance, but the defendant agreed to the interview of the foreperson, and, as we shall explain, he suffered no undue prejudice.

As for how the judge conducted the interview, he was scrupulous in attempting to steer the foreperson away from revealing any details of the deliberations. See *Commonwealth* v. *Connor, supra* at 844 ("judge must scrupulously avoid any questioning that may affect the juror's judgment[;] . . . the judge's words and actions must not convey any improper silent messages to the other jurors"); *Commonwealth* v. *Hebert, supra* at 755. That the foreperson blurted out certain details of the deliberations did not compromise the fairness of the trial. The judge, who interviewed the foreperson outside the presence of the other jurors, contrast *Commonwealth* v. *Webster, supra,* took care to avoid influencing the foreperson or the other jurors. See note 9, *supra.* Compare *United States* v. *Hotz,* 620 F.2d 5, 7 (1st Cir. 1980) (foreperson's unsolicited revelation of eleven-to-one division not ground for reversal), and *Commonwealth* v. *Clements,* 51 Mass. App. Ct. 508, 524 (2001), *S.C.,* 436 Mass. 190 (2002) (judge's direction to jury to continue deliberations following revelation of eleven-to-one division not implicit indorsement of majority view where judge did not attempt to influence jury's judgment), with *Commonwealth* v. *Webster, supra; Commonwealth* v. *Hebert, supra.* In addition, although the foreperson revealed that there was a difference of opinion on the jury, he did not say that the jury had reached an impasse.

The notes the judge received an hour later, one from the foreperson and one from juror no. 14, again did not say the jury were deadlocked, but raised issues that appeared to be personal to juror no. 14 — her belief that "the criminal justice system is corrupt" and her desire to go home. Following the teaching of the *Connor* case, the judge interviewed the juror to determine whether good cause existed to discharge her. See *Commonwealth* v. *Connor, supra.* See also *Commonwealth* v. *Swafford, supra.* Again the judge was scrupulous in instructing the juror not to disclose details of the deliberations: he focused on her ability to be impartial and to decide the case unaffected by her desire to go home.[15] With respect to the juror's impartiality, the judge apparently took her statement that there is "good and bad in

---

[15]When the juror blurted out that she did not "agree with them" — which the judge took to mean that she did not agree with the other jurors or the Commonwealth's evidence — the judge told her that her views were "perfectly

every profession" as meaning that she was not biased against the police witnesses: he concluded, "I don't see how, on this evidence, I discharge her." As for the juror's desire to go home, he found that it would "not overbear her ability to continue to deliberate and have her view made known to the other jurors, whatever that view may be." The judge declined to discharge the juror. For reasons we shall explain, his decision was sound.[16]

The judge was in the unique position to note the juror's demeanor, and nothing in the record leads us to conclude that his decision to retain her was clearly erroneous or an abuse of discretion. See *Commonwealth* v. *Clark*, 432 Mass. 1, 17 (2000) (decision on juror bias will be upheld absent abuse of discretion or clear error); *Commonwealth* v. *Martinez*, 431 Mass. 168, 179-180 (2000) (no abuse of discretion in declining to discharge jurors who were followed from court room by group of spectators; judge could rely on jurors' statements that each could render fair verdict); *Commonwealth* v. *Campbell*, 51 Mass. App. Ct. 479, 483-484 (2001) (no abuse of discretion in declining to discharge juror who expressed frustration about having to serve as juror). And in directing the jury to resume their deliberations, the judge said nothing to compromise the fairness of the deliberations. See note 12, *supra*.

When the jury returned forty-five minutes later with a non-unanimous verdict (after deliberating in total for about three hours), the defendant moved for a mistrial. He argued only, "[A]t

all right," and then refocused her on the issue of her ability to be impartial. When the juror later revealed, unsolicited, that the jury were split eleven to one, the judge said, "I do not want to know what they say and what you say. I want to know your desire to go home is not going to somehow overcome your ability to be a good, fair juror." Thus, in his responses to the juror's revelations, the judge avoided affecting the juror's judgment. Contrast *Commonwealth* v. *Webster*, 391 Mass. 271, 271-278 (1984); *Commonwealth* v. *Hebert*, 379 Mass. 752, 753-755 (1980). And, for the same reasons discussed above that the foreperson's unsolicited revelations did not unduly compromise the fairness of the deliberations, the same is true of juror no. 14's unsolicited revelations.

[16]The defendant was adamant that juror no. 14 *not* be discharged, no doubt because the juror appeared to disbelieve the Commonwealth's evidence. The judge, while in no way obligated to bow to the defendant's wishes, was entitled to take them into account when deciding whether to discharge the juror. And had the judge discharged her, it would have come as little surprise if the defendant had challenged that action on appeal.

this point, they are not going to reach a verdict." The judge, responding correctly, "You don't know that," denied the motion. The judge did not abuse his discretion. See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006); *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976).

First, there is no question that the judge had the authority to send the jury back to continue their deliberations. See G. L. c. 234, § 34 (if jury return after deliberation without unanimous verdict, judge "may state anew [any part of] the evidence or . . . the law applicable to the case and send them out for further deliberation"); Mass. R. Crim. P. 27 (d), 378 Mass. 897 (1979) (if jury not unanimous after polling, jury "may be directed to retire for further deliberations or may be discharged").[17] Second, we reject the defendant's claim that sending the jury back to deliberate was "likely" to result in juror no. 14's voting "guilty" merely to go home. The judge had questioned juror no. 14 specifically on whether her desire to go home would prevent her from deliberating fairly, and she confirmed that it would not. The judge was entitled to accept her representation. See *Commonwealth* v. *Martinez, supra.* See also *Commonwealth* v. *Connor*, 392 Mass. 838, 843 (1984); *Commonwealth* v. *Clements, supra*; *Commonwealth* v. *Campbell, supra.* In view of what the judge knew at the time that he denied the defendant's motion for a mistrial — particularly juror no. 14's representation that her desire to go home would not interfere with her ability to deliberate fairly — we cannot say that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Bys, supra.*

To be sure, the deliberations took several sharp turns, but the judge, with a responsive and steady hand, kept the jury on course by continually focusing them on their duties to deliberate fairly. At each step of the way the judge acted reasonably in handling the messages he received from the foreperson and juror no. 14, and in taking into account the concerns of the attorneys. The crucial junctures involved interviews with the foreperson and

---

[17]The jury gave no indication that they were deadlocked, and so the judge did not give the *Tuey-Rodriquez* charge. See *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 (1851), and *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A). He gave them a short instruction to resume their deliberations. See note 13, *supra.*

juror no. 14, and because the judge, unlike us, was in a position to evaluate the demeanors of those jurors in deciding what action to take, we defer to him. See *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000). That juror no. 14 eventually changed her vote from "not guilty" to "guilty" does not show that she "likely" did so merely to go home. We do not know what occurred in the jury room after the jury were sent back to resume their deliberations, nor did the judge make any postverdict findings regarding juror no. 14. All we know about that final period of deliberations is that the judge was careful to avoid influencing the jurors' judgment, see note 13 *supra*, and that the jury deliberated for an additional one-half hour before returning with a unanimous verdict. The record thus reveals no facts regarding the jury's final one-half hour of deliberations to alter our conclusion that the judge properly exercised his discretion in denying the defendant's motion for a mistrial.

c. *School zone measurement*. Having waived the issue at trial, the defendant argues on appeal that a substantial risk of a miscarriage of justice infected the school zone conviction because the Commonwealth neglected to lay a proper foundation for Officer Duke's testimony regarding the measurement between the scene of the drug transaction and the school. Specifically, he claims the Commonwealth failed to establish the accuracy of the Measure-Master. The record refutes that claim. Officer Riordan testified that, during the same month that the offenses were committed, he calibrated the MeasureMaster by using it to measure a known distance, and that the device was accurate. The defendant has offered no reason to conclude that the method used to calibrate the MeasureMaster was deficient, or that the judge abused his discretion in admitting the testimony of Officer Duke and Officer Riordan. Cf. *Commonwealth* v. *Whynaught*, 377 Mass. 14, 19 (1979) (whether particular radar device shown to be sufficiently accurate to measure automobile's speed is matter for trial judge's discretion; judge guided by quality of testing procedures used). See *Charley* v. *State*, 651 N.E.2d 300, 302-304 (Ind. Ct. App. 1995) (testimony regarding measuring wheel's accuracy provided sufficient foundation to admit evidence that drug offense occurred within 1,000 feet of school). In addition, Officer Riordan testified that, on various occasions, unconnected with this case,

he measured the distance between the Lafayette Club and the Morgan Elementary School, and that the distance was well under 1,000 feet (in the "850 range"). There was no error.

*Judgments affirmed.*